[No. 15288. In Bank. — September 11, 1893.]

## In the Matter of CHARLES M. SHORTRIDGE, Petitioner for Writ of Certiorari.

Contempt — Publication of Evidence in Divorce Case — Certiorari. — The publication in a newspaper of a true report of the testimony of the witnesses in a divorce case cannot be said to tend to embarrass, impede, or obstruct the administration of justice, and is not a contempt of court, although the court has ordered that no publication be made of the testimony in the case; and an order punishing the editor and publisher of the paper for contempt of court on account of such publication will be annulled upon *certiorari*.

Id. — Right to Publish Judicial Proceedings. — The public have the right to know, discuss, and publish all judicial proceedings unless such right is expressly interdicted by constitutional or statutory provisions, or unless the publication prohibited by the order of the court is of such a nature as to obstruct or embarrass the court in its administration of the law and the execution of the powers expressly conferred upon it.

ID. — POWER OF COURT TO PUNISH ACTS IMPEDING OR OBSTRUCTING DISCHARGE OF DUTIES. — A court has the inherent power, in the absence of a limitation placed upon it by the power which created it, to punish as a contempt any act which tends to impede, embarrass, or obstruct the court in the discharge of its duties, regardless of whether or not the act is committed in or out of its presence.

ID. — OBJECT OF PRIVACY OF DIVORCE TRIALS. — The object of section 125 of the Code of Civil Procedure which provides that in actions for divorce, and other enumerated cases, the court may direct the trial to be private and exclude all persons except the officers of the court, the parties, and their counsel, was to secure decorum in the conduct of trials involving the relation of the sexes, and to protect witnesses of refined sensibilities from giving testimony of a delicate or filthy nature in the presence of a crowd of vulgar or curious spectators, and it was not intended for the protection of the public from the influence of revelations often made in such cases, or to prevent the publication of the evidence.

ID. — INTERFERENCE WITH PROCEEDINGS OF COURT — FINDING NOT CONCLUSIVE. — The finding of a court upon the hearing of an order to show cause why the editor of a newspaper should not be punished for contempt of court for the publication of the testimony in a divorce case, that the publication was an unlawful interference with the proceedings of the court, is not conclusive, and where it appears from all the facts found that the publication could not, under any circumstances, constitute a contempt, a judgment thereon imposing a fine or imprisonment is a nullity.

HEARING in the Supreme Court upon writ of *certiorari*, in review of a judgment of the Superior Court of Santa Clara County.

The facts are stated in the opinion of the court.

*John E. Richards, S. M. Shortridge*, and *D. M. Delmas*, for Petitioner.

The court has jurisdiction of the writ. (Code Civ. Proc., secs. 51, 1067–1077.) The superior court by its finding could not find itself with a jurisdiction which it had not acquired by the affidavit, which avers no interference with the proceedings of the court. (*Batchelder* v. *Moore*, 42 Cal. 412; *McConnell* v. *State*, 46 Ind. 298; *People* v. *Brotherson*, 36 Barb. 662; *Potter* v. *Low*, 16 How. Pr. 549.) The jurisdiction of the court was limited to the offense charged. (Code Civ. Proc., secs. 1211–1218.) Section 125 of the Code of Civil Procedure, upon which the order for private hearing was based, did not justify an order forbidding publication of the proceedings. The statutes favor and protect the fair and truthful publication of judicial proceedings, without malice. (Civ. Code, secs. 47, 48; Pen. Code, secs. 166, 254; Stats. 1891, p. 7.) The general advantage of publicity of judicial proceedings is more to be

regarded than individual injury. (*Rex* v. *Wright*, 8 Term Rep. 298; *Wason* v. *Walter*, Law R. 4 Q. B. 73; *Gathercole* v. *Miall*, 15 Mees. & W. 333.) Section 125 of the Code of Civil Procedure should not be enlarged by intendment so as to conflict with other statutory provisions. (*Batchelder* v. *Moore*, 42 Cal. 412; *Cheadle* v. *State*, 110 Ind. 301; 59 Am. Rep. 199.) Section 1032 of the Code of Civil Procedure does not prohibit publication by a newspaper of divorce proceedings. The press has a constitutional immunity from punishment for publication not harmful, when tested by the standard of the law. (Cooley's Constitutional Limitations, 421; *United States* v. *Holmes*, 1 Wall. Jr. 1–11; *Commonw.* v. *Blanding*, 3 Pick. 313; 15 Am. Dec. 214; Rapalje on Contempts, sec. 56.)

*F. E. Spencer*, *D. W. Burchard*, and *Nicholas Bowden*, for Respondent.

Paterson, J. — When the case of *Price* v. *Price* — an action for divorce — was called for trial in the superior court of Santa Clara County, the court was advised that the evidence would probably be of a filthy nature, and thereupon made an order directing "that during the trial all persons be excluded from the court-room except the officers of the court, the parties, and their counsel." It was further ordered "that no public report or publication of any character of the testimony in the case be made." On the following day the petitioner herein caused to be published in the San Jose Mercury, a newspaper of which he was the editor and publisher, an article referring to the order of the court and containing what purported to be the testimony of the witnesses. Upon an affidavit setting forth the facts stated, the court made an order commanding Shortridge to appear and show cause why he should not be adjudged guilty of contempt. Mr. Shortridge in his answer and at the hearing disclaimed any intention to reflect upon the court, or show any disrespect therefor, and claimed that in publishing a fair and true report of the testimony and proceedings, he was simply exercising a constitutional right with which the court could not interfere by order or otherwise. Thereafter an opinion was filed showing that the learned judges of the court, sensible of the delicate position they occupied in determining the scope of

their own judicial powers, had given the subject most careful consideration, and holding it to be their duty in support of the honor of the state and the dignity of the court to punish the respondent for violating the order.   A judgment was entered adjudging Shortridge guilty of contempt of court, and ordering him to pay a fine of one hundred dollars.   Thereupon the petitioner herein applied for a writ of *certiorari*, which was granted, and the matter having been heard and submitted, we are now called upon to determine whether the court exceeded its jurisdiction in adjudging the petitioner guilty of contempt on the facts stated.

In support of the order under consideration counsel for respondents rely upon two propositions, namely: 1. That the order was authorized by sections 125 and 1209, subdivisions 5 and 9 of the Code of Civil Procedure; and 2. That the publication was an interference with judicial proceedings which the court had the inherent power to punish as a contempt.

1. The sections referred to read as follows:—

"Sec. 125.   In an action for divorce, criminal conversation, seduction, or breach of promise of marriage, the court may direct the trial of any issue of fact joined therein to be private, and may exclude all persons except the officers of the court, the parties, their witnesses, and counsel; provided that in any cause the court may, in the exercise of a sound discretion during the examination of a witness, exclude any or all other witnesses in the cause."

"Sec. 1209.   The following acts or omissions, in respect to a court of justice or proceedings therein, are contempts of the authority of the court: . . . .

"5.  Disobedience of any lawful judgment, order, or process of the court.

"9.  Any other unlawful interference with the process or proceedings of a court."

It may be well to note that petitioner was not a party, a witness, or an officer of the court; and that no order was made excluding the witnesses from the court-room.   The question, therefore, whether a witness, party, officer, or other person over whom the court has acquired jurisdiction, may be punished for disclosing testimony when the trial is had with closed doors,

XCIX. CAL.—34

and the question whether it is a contempt for a newspaper to publish the evidence after an order has been made *excluding the witnesses* from the court-room during the trial, must be eliminated from the consideration of the case. The court planted its conclusion squarely upon the ground that "the evident purpose of the act was that in cases of divorce . . . . the entire evidence should not be produced before the public," saying: "Of course the main purpose of this enactment was to promote public morals. . . . . How the public morals can be promoted by detailing to the world the testimony in low and filthy divorce cases, or blazoning forth the injuries that some poor unfortunate girl may have suffered, or by heralding the connection of good and respectable and moral people where they are unfortunately and unwillingly as witnesses, is something that the court cannot understand, and which the legislature unquestionably intended to prohibit. . . . . It is the disposition of every man to protect his fireside. It is his disposition to raise his children up in the moral way. It is his desire to keep all contaminating influences from them, and I think the legislature has wisely and properly placed in these particular actions the power in the court to do so, and that the court would be recreant to its duty if it did not undertake to discharge the duty cast upon it."

Every one who has the welfare of society at heart will doubtless agree with the learned judges of the court below in their opinion as to the policy of a law which would prevent the publication of such matters as they complained of; but the construction placed upon the provisions of the act quoted above is not, we think, authorized by the language of the section. In this country it is a first principle that the people have the right to know what is done in their courts. The old theory of government which invested royalty with an assumed perfection, precluding the possibility of wrong and denying the right to discuss its conduct of public affairs, is opposed to the genius of our institutions in which the sovereign will of the people is the paramount idea; and the greatest publicity to the acts of those holding positions of public trust, and the greatest freedom in the discussion of the proceedings of public tribunals that is consistent with truth and decency are regarded as essential to the

public welfare. Therefore, when it claimed that this right has in any manner been abridged, such claim must find its support, if any there be, in some limitation expressly imposed by the law-making power, or the right to exercise the authority claimed must be necessarily implied as essential to the execution of the powers expressly conferred. We find no expression in the section referred to upon which such a claim can be based. If the legislature had intended to prohibit the publication of proceedings in cases tried with closed doors, it would have been easy to declare its will in that regard in express terms. It has not done so, and the right claimed is not essential to the execution of the authority conferred by the section. The assumption that the object of the statute was to protect the public from the contaminating influence of prurient revelations often made in actions of divorce, seduction, and criminal conversation is unwarranted. The object of the act is palpable. It was to secure decorum in the conduct of trials involving the relation of the sexes and to protect witnesses of refined sensibilities from the ordeal which they might otherwise have to pass through in giving testimony of a delicate or filthy nature in the presence of a crowd of vulgar or curious spectators. To give effect to the section no other intention on the part of the legislature is necessarily implied, and proceedings for contempt being criminal in their nature, no presumption should be indulged.

Section 1032 of the Political Code adds no strength to the position taken by counsel for respondent. What has been said of section 125 of the Code of Civil Procedure is applicable to section 1032, and may be summed up in the proposition that the public have the right to know and discuss all judicial proceedings, unless such right is expressly interdicted by constitutional or statutory provisions, or unless the publication prohibited by the order of the court is of such a nature as to obstruct or embarrass the court in its administration of the law and the execution of the powers expressly conferred upon it.

2. Counsel for petitioner contend with much emphasis that any act of the legislature or of the court attempting to deprive the people of the right to be informed of judicial proceedings, or to publish or discuss the same, is void. It is said that secrecy and silence in such matters are utterly repugnant to the

spirit of our institutions, and opposed to the constitutional declaration of right with respect to free speech and the liberty of the press. Provisions of the codes are cited showing that the legislature has sought to abridge rather than to extend the common-law right of the courts to punish for contempt. Most of them relate purely to questions of libel, but .one of them — a recent act of the legislature— provides that "no speech or publication reflecting upon or concerning any court or any officer thereof, shall be treated or punished as a contempt of said court, unless made in the immediate presence of such court while in session, and in such manner as to actually interfere with its proceedings." (Stats. 1891, p. 7.) But we know of no decision which supports the proposition contended for. No authority has been found which denies the inherent right of a court, in the absence of a limitation placed upon it by the power which created it, to punish as a contempt an act — whether committed in or out of its presence — which tends to impede, embarrass or obstruct the court in the discharge of its duties. It is a doctrine which is admitted in all its rigor by American courts everywhere, and does not need the support of foreign authorities based upon the fiction that the majesty of the king, represented in the persons of the judges, is always present in the court. It is founded upon the principle — which is coeval with the existence of the courts, and as necessary as the right of self-protection — that it is a necessary incident to the execution of the powers conferred upon the court, and is necessary to maintain its dignity, if not its very existence. It exists independent of statute. The legislative department may regulate the procedure and enlarge the power, but it cannot without trenching upon the constitutional powers of the court and destroying the autonomy of that system of checks and balances, which is one of the chief features of our triple-department form of government, fetter the power itself. In Arkansas the legislature sanctioned the power of the court to punish as contempts certain enumerated acts, *and no others.* The court held that the sanction was merely declaratory of the common law, and that the prohibitory clause was entitled to respect as an opinion of a co-ordinate branch of the government, but was not binding upon the courts. (*State* v. *Morrill,* 16 Ark. 384.) This decision is in line with all the authorities.

Although the power is necessarily an arbitrary one to a great extent, it has been exercised by the courts, in this country at least, only as an auxiliary means to attain the ends of justice. If abused by the judges at all, it has been only in the rarest instances. No one has realized more than the judges themselves the fact that a court cannot coerce the respect of the people for itself or its decisions, and the very delicacy of the power has proved to be a safeguard against its abuse. To this alone must be attributed the fact that, although the inherent power referred to has been claimed and exercised by the courts of this country since the organization of the government, the framers of the constitution in all the states of the Union, except Georgia and Louisiana, have deemed it unnecessary to place any limitation upon the power of their courts to punish for contempts. (Stimson's American Stat. Law, sec. 582.)

Did the article in question tend to embarrass, impede, or obstruct the administration of justice? If it did, the petitioner is guilty of contempt, regardless of the order. In determining the question whether the conduct of the petitioner was an unlawful interference with the proceedings of the court, the order itself is a false quantity. As said by his counsel at the argument: "If the law, under the circumstances, prohibited the publication, the order of the court was superfluous; and the petitioner is censurable, regardless of that order, for the all-sufficient reason that he has violated the law. If, on the other hand, the law did not prohibit the publication, the petitioner had the right, under the law, to make it, and that right could not be abridged or taken away by an order."

The constitution of every state in the Union guarantees to every citizen the right to freely speak, write, and publish his sentiments on all subjects, and prohibits the passage of any law "to restrain or abridge the liberty of speech or of the press." What one may lawfully speak he may lawfully write and publish. The rights thus preserved by the constitution are dear to the heart of every American, and their exercise can be complained of by the courts in a summary proceeding only when the publication or the speech interferes with the proper performance of judicial duty. If there has been no such interference, there has been no contempt. In the article complained

of we find nothing which could have interfered with a full and fair investigation of the merits of the case then on trial. The case was before the court without a jury. It is not claimed that the petitioner, in his report, mutilated the testimony, misrepresented or reflected upon the judge, attempted to intimidate or swerve any witness, or to dictate to any one connected with the trial what his action should be in regard to any matter. How, then, could such an article interrupt the orderly conduct of a trial, or tend to induce a failure of justice? With the moral aspect of the case we have nothing to do. The courts are not conservators of public morals. Rules affecting the conduct and morals of the community must proceed from the legislative department. It is argued with some plausibility that the publication of the testimony might deter timid and highly sensitive witnesses from making disclosures which they would make if assured that their utterances would not be given publicity. But this is an argument which would apply to all cases, and rests upon the erroneous assumption that a witness will violate his oath to tell the truth, and the whole truth, to save himself from the mortification incident to the relation and publicity of certain disagreeable facts within his knowledge. There is no real danger of such a result. The testimony which a witness gives in a court of justice is not the discussion of a topic voluntarily selected by him, and for which he may choose his language, and use chaste or unchaste words, regardless of the truth of the facts he is required to detail; and every witness is supposed to appreciate this fact, and to speak the truth without regard to the question who or how many will be informed of the proceedings. We are aware of the fact that there are English precedents for holding that the courts possess and exercise the power to prohibit in all cases the publication of their proceedings; but we know of no decision in this country upholding the right of a court to make such prohibition, except where the publication tended to interfere with the proceedings before the court. Blackstone lays it down as the law of England in his day that it was unlawful and a contempt of court "to print false accounts (or even true ones without proper permission) of causes then dependent in judgment." (4 Blackst. Com. 285.) Several English cases are cited which seem to hold this

doctrine to the extent stated.   But precedents promulgated at a time when the ministers of the crown claimed and exercised the right to seize a newspaper and stifle the voice of its editor, when books were destroyed and speeches suppressed to subserve political purposes, are of little value in this age, and especially in this country.   It was to forever stamp out such a claim and prevent such occurrences that the framers of our constitutions incorporated therein the guarantee of liberty of speech and of the press.   This constitutional liberty, as Judge Cooley says, "implies the right to freely utter and publish whatever the citizen may please, and be protected against any responsibility for so doing, except so far as such publications from their blasphemy, obscenity, or scandalous character may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals, . . . . implies not ony liberty to publish, but complete immunity from legal censure and punishment for the publication *so long as it is not harmful in its character when tested by such standards as the law affords."* (Cooley's Constitutional Limitations, p. 421.)   Liberty of the press must not be confounded with mere license.   Liberty of the press stops where a further exercise would invade the rights of others.   This provision of the constitution does not authorize a usurpation of the functions of the courts.   Under the plea of the liberty of the press a newspaper has no right to assail litigants during the progress of a trial, intimidate witnesses, dictate verdicts or judgments, or spread before juries its opinion of the merits of cases which are on trial.   As stated before, what may be spoken may be written, and the converse of the proposition is true that what may not be spoken under such circumstances may not be written.

As the article in question does not go beyond these limitations, and as the section under which the court below proceeded to judgment clearly does not authorize the order which was made, the proceedings must be annulled.

Counsel for respondent claim that the finding of the court that the publication was an unlawful interference with the proceedings of the court, and, therefore, a contempt, must be taken as conclusive. · But, where it appears from all the facts found that the publication could not, under any circumstances, con-

stitute a contempt, a judgment thereon imposing a fine or imprisonment is a nullity.

It is ordered that the proceedings of the court under review be and they are hereby annulled, and the clerk of this court is directed to transmit a copy of the judgment to the clerk of the court below.

DE HAVEN, J., FITZGERALD, J., HARRISON, J., and McFARLAND, J., concurred.