[Civ. No. 31326.   Second Dist., Div. One.   July 6, 1967.]

GEORGE L. VAUGHN, JR., Plaintiff and Appellant, v. THE MUNICIPAL COURT OF THE LOS ANGELES JUDICIAL DISTRICT OF LOS ANGELES COUNTY, Defendant and Respondent.

350

Robert J. Hall and Morris T. Johnson for Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, and Robert C. Lynch, Assistant County Counsel, for Defendant and Respondent.

LILLIE, J.—Appellant, an attorney at law, was adjudged guilty of two counts of contempt (1) for his wilful misrepresentation to respondent court on Sepember 13, 1965, of the fact that he was required to appear in the federal district court in Chicago on September 14, 1965, for pretrial in *Sibley* v. *Illinois Central Railroad*; and (2) for his wilful failure to appear for trial of *People* v. *Powers* on September 15, 1965, in

compliance with the lawful order of respondent court.[1] On his petition the superior court (department 70) issued writ of certiorari; thereafter judgment was entered affirming judgment of respondent court and discharging the writ. Appeal is taken from the superior court judgment.

In addition to the formal judgment roll, there are included in the record a number of exhibits consisting of reporter's transcripts of various proceedings in respondent Court (Exhs. M through U); Findings and Order of Contempt and Commitment (Exh. A); certified copy, Docket, United States District Court, *Sibley* v. *Illinois Central Railroad* (Exh. B) and minute orders of respondent Court (Exhs. C through G; L). The Findings and Order of Contempt and Commitment are extensive; the facts therein are stated in such detail and with such particularity as to leave no doubt that two acts of direct contempt occurred. The following is a summary of the evidence which amply supports the findings and adjudication.

The genesis of the controversy arose out of appellant's representation of defendant Powers in criminal case No. 219 351, on trial in Division 26 of respondent municipal court on September 13, 1965. On that day, to obtain a continuance of the trial, appellant, in open court, represented to Judge Nebron that he was required to be in the federal district court, Chicago, Illinois, the next day, September 14, 1965, at 1:30 p.m., for a pretrial hearing in *Sibley* v. *Illinois Central Railroad*; he also represented that he was scheduled to leave on the 6:30 a.m. plane and "fly out of [Chicago] at 5:30 and be back here at 9:00 o'clock tomorrow night [September 14, 1965]." Relying upon appellant's representation, the judge adjourned *Powers* to Wednesday, September 15, 1965, at 8 a.m., and in open court instructed all persons to appear at that time. Appellant was present and heard and understood the order; in fact, upon being asked by the judge about adjourning to September 15, 1965, he answered, "Well, that [date] would be all right with me"; and the judge set the hour of appearance on that day for 8 a.m. specifically to accommodate appellant who also represented that he had other appearances on that day at 9 a.m.

The following day, September 14, 1965, around 3:30 p.m.,

---

[1]Appellant was ordered committed to five days in the county jail and fined $500 on each count, the jail sentences to run concurrently; in default of the payment of the total fine of $1,000, he was ordered imprisoned in the county jail one day for each $100, or fraction thereof, not to exceed ten days.

appellant's secretary telephoned the clerk, Division 26, "saying that Mr. Vaughn wanted a continuance" of *Powers* trial from September 15, 1965, to some future date; upon direct instructions of Judge Nebron the clerk told her that he "said no, that Mr. Vaughn would have to make the appearance"; she replied, "Oh, dear, I think he's already gone" (to Washington), "Could someone else come and make the appearance for him?"; the clerk said, "Anyone can come into this courtroom"; at no time did the clerk advise appellant's secretary that appellant was excused from appearing on September 15, 1965, or that any other lawyer could appear for him. Appellant's secretary testified that she did not report this conversation to anyone; thus, appellant could have known nothing of this discussion.

The next day, September 15, 1965, at 8:05 a.m., respondent Court convened for further trial of *Powers*; all persons except appellant were present, as ordered, and ready to proceed. Attorney Odis Jackson appeared and told Judge Nebron that he was there for the purpose of continuing the matter on behalf of appellant; had not discussed the case with appellant, only with his secretary; did not know *Powers* was on trial but thought it was a motion; had never seen Powers, did not represent him, had not consented to represent any of appellant's clients and was not prepared to try the case; had been told about the appearance for the first time by appellant's secretary between 3:30 and 4 p.m. on the day before (September 14); thought appellant's wife was having a baby and knew nothing about appellant going to Washington, D.C. Then the clerk, upon instructions of the judge, called appellant's secretary who told her that appellant "was called to Washington, D.C. . . . regarding a national bank" and "he left about 10 o'clock yesterday [September 14, 1965] and would be back on Friday [September 17, 1965]." Thus, Powers was left without representation in the middle of a criminal trial; he had not been advised by appellant that he would not appear and his trial was continued to September 30, 1965.

On September 29, 1965, appellant called the clerk by telephone requesting another continuance of *Powers*; upon specific instruction of Judge Nebron, the clerk refused his request, told him he must appear and advised him that the court "was reserving jurisdiction in this matter to issue a possible contempt citation" against him.

The next morning (September 30) appellant appeared;

respondent Court advised him that it was reserving jurisdiction for contempt proceedings; the *Powers* trial was concluded; and the contempt hearing was set for Ocober 13, 1965.

Two hearings (October 13, 1965, and December 22, 1965) were held. In connection with count I, appellant's first explanation (October 13) for having represented to the court that he was required to be in Chicago on September 14, 1965, was that on September 13, 1965, he believed that the pretrial of *Sibley* v. *Illinois Central Railroad* was set in the United States District Court for September 14, 1965. He testified that after 5 p.m. on September 13 he called Mr. Cerne, attorney for the railroad in Chicago in *Sibley* but. was told he had gone home; two hours later, Cerne called him and discussed settlement; Cerne told him he would have to submit the offer to his company and that he *(Cerne) would call the court and have the pretrial go over*. Appellant admitted he had never made any reservation for transportation to Chicago on September 14, 1965, to attend the pretrial of *Sibley* v. *Illinois Central Railroad*.

On the second hearing (December 22, 1965), certified copy of Docket, No. 64-C 1190, United States District Court, Northern District of Illinois, *Sibley* v. *Illinois Central Railroad*, was received in evidence; it showed that there had been no hearing scheduled in that case on September 14, 1965, but that it was scheduled for September 22, 1965. Given further opportunity to explain, appellant then told a second, new and different version, conflicting with that given by him on October 13, 1965. He testified that on September 10, 1965, he had been advised by Eskridge, co-respondent counsel in Chicago in *Sibley*, that the pretrial would be held September 14, 1965, at 1.30 p.m. but thought there was a good chance of settlement; on September 13, 1965, between 7:30 and 9 p.m., he called Eskridge in Chicago who told him the pretrial would not be held on September 14, 1965, but on September 22, 1965. However, at a later point in his testimony, appellant stated that in his conversation with Eskridge on September 13, 1965, Eskridge advised him that the matter was being negotiated and *he (Eskridge) would call the attorney for the railroad and have the pretrial go over*. In appellant's personal day book and office calendar the *Sibley* pretrial was shown as set for both September 14, 1965, and September 22, 1965; he did not explain the conflict in dates and was unable to identify the handwriting on the conflicting entries.

354

Finding that in the course of a criminal trial "in the immediate view and presence of the Court," and for the purpose of obtaining a continuance, appellant represented to the court that he was required to be in the federal district court in Chicago on September 14, 1965, at 1:30 p.m., for a pretrial of *Sibley* v. *Illinois Central Railroad*; based upon this representation, the court continued the trial of *Powers* to September 15, 1965, at 8 a.m., instructing appellant to appear then for further trial of *Powers,* the hour of appearance having been set to accommodate appellant; at no time was any pretrial hearing in *Sibley* ever set by the federal district court for September 14, 1965, but was in fact set for September 22, 1965; appellant's representation to the court that he was required to be in the federal district court in Chicago on September 14, 1965, was wilfully false; the misrepresentation was wilfully made by him to the court and appellant's explanations for his misrepresentation were wholly in conflict with each other, in part inherently improbable, not worthy of belief, and did not constitute sufficient explanation, reason, or excuse for his conduct in making the misrepresentation, respondent Court adjudged appellant in contempt.

In connection with count II, appellant's explanation for failing to appear for Powers' trial on September 15, 1965, as ordered, was that he went to Washington, D.C., on September 14, 1965, in connection with an application for a bank charter on behalf of a group of Negro clergymen and others called the Committee To Organize The National Bank of Commerce which he represented as attorney. He testified that this group had threatened to initiate picket lines in front of and distribute literature urging a boycott of two banks in the Negro community on September 19, 1965, and if this occurred would cause a second race riot in Los Angeles; to avoid this it was necessary for him to go to Wahington, D.C., on an emergency basis to negotiate for the bank charter for his group; a telegram signed by him and Reverend Brookins was sent by the committee August 25, 1965, to James Saxon, Comptroller of Currency, United States Treasury Department, Washington, D.C., informing him that commencing September 19, 1965, two hundred Baptist ministers would initiate the picket lines and distribute literature urging the boycott. Appellant told Judge Nebron under oath that if the bank charter were granted to the group he represented and the bank established, he anticipated he would hold stock therein, probably be chairman of the board of directors and be retained to repre-

sent the bank as attorney. Further, he testified that on September 14, 1965, in a three-way conference telephone call with a Dr. Brimer and Reverend Dawkins in Washington, they urged him to come to Washington, D.C., at once to work on the issuance of the charter to prevent the demonstration; he said he was due in court the next morning, but they urged him to make arrangements for someone else to appear; he called his secretary asking her to call respondent Court to see if *Powers* could be continued or someone else could appear; thereafter, his secretary reported that she had talked to the clerk who said that someone else could appear for him whereupon he called Dawkins; in the early evening of September 14, 1965, he left the file of *Powers* at the home of Odis Jackson but did not talk to Jackson.

On behalf of respondent Court, Reverend H. Hartford Brookins testified that he was chairman of the United Civil Rights Committee, comprising forty-five organizations addressing themselves to civil rights activities in the Negro area in Los Angeles. Appellant strenuously objected to further testimony of Reverend Brookins on the ground that it would be ''unreasonable,'' ''unfair'' and ''unjust'' to him (appellant) to have Brookins questioned. Reverend Brookins' testimony was very damaging to appellant's credibility. He testified that where civil rights groups have planned demonstrations he knows of these plans, particularly if the demonstration is to be on any significant scale and relates to matters of concern to the Negro community; at no time was he ever informed of any planned demonstration on or about September 19, 1965; he did not authorize the use of his name in a telegram relating to the National Bank of Commerce; there would be no broad interest in or concern of the Negro community over procedures connected with granting a bank charter unless it was being denied on grounds of race, and it never came to his attention that the bank charter being sought by appellant's group was of interest in the Negro community or to any civil rights group; he did not know of any plan for picket lines in front of or for distribution of literature urging a boycott of any bank on or about September 19, 1965; when a demonstration is being planned, information has to be put out widely to the Negro community in order to attract demonstrators; he had no information from any source in the community that there was any plan for a mass demonstration on September 19, 1965, and if any such were planned, he and his organization would know of it.

Appellant's secretary testified to a conversation with the clerk between 2 and 3 p.m., September 14, 1965, in which she requested a continuance in *Powers*; the clerk advised her that someone would have to be in court and the matter could not be continued; she did not ask whether another lawyer could appear and she was not informed that appellant was excused; after this call she *did not report* this conversation to anyone; she had known for three or four hours prior to her call to the clerk that appellant planned to go to Washington.

Reverend Maurice A. Dawkins, appellant's witness testified that he is Associate Director of The Vista Program; on September 14, 1965, in Washington, D.C., he had a telephone conversation with appellant in which he suggested that appellant come to Washington because there was an opportunity to do something positive toward establishing a Negro bank in Watts; he had no information concerning a planned massive demonstration until he talked to appellant and received a telegram sent by a group appellant represented; he assumed it would consist of peaceful picketing but did not know the details or how many would participate, nor did he know if the demonstration would be carried out; he opposed the idea of picketing; he did not participate in a conference call on September 14, 1965, which included Dr. Brimer; appellant did not advise him on September 14, 1965, that he was engaged in trial and the first he knew of it was on September 15, 1965, when a call from Los Angeles sought to locate appellant and he (Dawkins) was advised of a problem concerning a trial which had to be straightened out.

Finding that the court ordered appellant to appear in Division 26, at 8 a.m. on September 15, 1965, for the trial of *Powers*; the order was made in open court in appellant's presence and he heard and understood the order; appellant failed to appear on September 15, 1965, as ordered; appellant had the ability to comply with the court's order and wilfully neglected and failed to appear without sufficient reason or excuse; and appellant's testimony is not worthy of belief and does not constitute a sufficient explanation for his failure to appear, respondent Court adjudged appellant guilty of contempt.

In a rambling brief which fails to conform to the requirements of rule 15(a), California Rules of Court, appellant cites at random cases of indirect contempt, quotes general statements of law and, in a factual argument based on testimony favorable to him, seeks determinations by this court

that his misrepresentation was based upon "a mistaken belief" and was not a "wilful misstatement of fact"; and that he did not fail to make an appearance on September 15, 1965, he having sent another lawyer "who was in possession of sufficient knowledge concerning the case to proceed" which, he was given reason to believe from the clerk's statement to his secretary, was sufficient.

■ "An order adjudging a person guilty of contempt in the immediate view and presence of the court must recite facts showing acts which constitute a contempt. (Code Civ. Proc., § 1211.) This is jurisdictional, and an order which assumes to punish summarily a direct contempt of court is void unless it shows on its face facts sufficient to constitute a legal contempt. (*Raiden* v. *Superior Court,* 34 Cal.2d 83, 86 [2] [206 P.2d 1081]; *In re Wells,* 29 Cal.2d 200, 201 [2] [173 P.2d 811]; *Ex parte Hoar,* 146 Cal. 132, 133 [79 P. 853].) Such facts must be stated with sufficient particularity to show, without the aid of speculation, that a contempt actually occurred. (*Blake* v. *Municipal Court,* 144 Cal.App.2d 131, 136 [7] [300 P.2d 755] [hearing denied by the Supreme Court].) " (*Chula* v. *Superior Court,* 57 Cal.2d 199, 203 [18 Cal.Rptr. 507, 368 P.2d 107, 97 A.L.R.2d 421].) ■ In the present case it is clear that the Findings and Order of Contempt and Commitment meet the foregoing requirement; voluminous facts supporting each count are stated therein that appellant in the presence of the court committed a contempt. "Thus, the responsibility of this court is merely to ascertain whether there was sufficient evidence before the trial court to sustain its judgment and order." (*Arthur* v. *Superior Court,* 62 Cal.2d 404, 409 [42 Cal.Rptr. 441, 398 P.2d 777].)

As to count I, appellant challenges Judge Nebron's factual determination that he wilfully made the misrepresentation knowing it to be false. That appellant knew the falsity of his misrepresentation at the time he made it and deliberately directed the same to the judge to mislead him is demonstrated by the elaborate detail with which, on September 13, 1965, appellant related to him the plane schedule of his trip to Chicago, and his later admission (October 13, 1965) that he had never made any arrangements for transportation to Chicago on September 14, 1965; his conflicting explanations concerning his misrepresentation; and his failure to explain the conflict of dates in entries in his office records and identify the handwriting thereof. The judge simply did not believe appellant's testimony; he rejected appellant's expla-

nation of "mistaken belief" and lack of wilfulness in making the "misstatement of fact." This court must accept the judge's factual determination. (*Bridges* v. *Superior Court,* 14 Cal.2d 464, 485 [94 P.2d 983]; *Arthur* v. *Superior Court,* 62 Cal.2d 404, 410 [42 Cal.Rptr. 441, 398 P.2d 777].)

▮ Appellant's misrepresentation of a fact to respondent Court for the purpose of obtaining a continuance was a deliberate deceit and a wilful obstruction of the orderly processes of respondent Court; an intentional violation of his duties as a member of the Bar and officer of the court, his conduct is denounced by law and constitutes contempt. Among others, the following acts in respect to a court are contempts of the authority of the court: "Misbehavior in office, or other wilful neglect or violation of duty by an attorney, counsel, clerk, sheriff, coroner, or other person, appointed or elected to perform a judicial or ministerial service" and "Any other unlawful interference with the process or proceedings of a court." (§ 1209, subds. 3, 8, Code Civ. Proc.)

▮ Further, the law imposes upon an attorney at law a duty "(d) To employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never to seek to mislead the judge of any judicial office by an artifice or false statement of fact or law." (§ 6068, subd. (d), Bus. & Prof. Code.) "The presentation to a court of a statement of fact known to be false presumes an intent to secure a determination based upon it and is a clear violation of the quoted provision. [§ 6068, Bus. & Prof. Code.] . . .

▮ The conduct denounced by the Business and Professions Code is not the act of an attorney by which he successfully misleads the court, but the presentation of a statement of fact, known by him to be false, which tends to do so. It is the endeavor to secure an advantage by means of falsity which is denounced." (*Pickering* v. *State Bar,* 24 Cal.2d 141, 144-145 [148 P.2d 1].) ▮ Deceit, whether negative or affirmative in nature, may form the basis of a charge for contempt. (*Daily* v. *Superior Court,* 4 Cal.App.2d 127, 131-133 [40 P.2d 936].)

▮ Further, the court has inherent power to punish for acts committed in the immediate view and presence of the court where they impede, embarrass and obstruct the court in the discharge of its duties. (*Raiden* v. *Superior Court,* 34 Cal.2d 83, 86 [206 P.2d 1081]; *In re Shortridge,* 99 Cal. 526, 534 [34 P. 227, 37 Am.St.Rep. 78, 21 L.R.A. 755].) ▮ The enforcement of an order of contempt is for the maintenance

of the dignity and authority of the court, and to preserve the peace and dignity of the People of the State of California. (*American Fire etc. Service* v. *Williams,* 171 Cal.App.2d 397, 402 [340 P.2d 644].)

In connection with count II, in open court and in the presence and hearing of appellant, respondent Court, on September 13, 1965, ordered all persons to return on September 15, 1965, to resume Powers' trial. The record does not show that appellant by name was ordered to return, but the circumstances leave no doubt that such order directed him to appear on September 15, 1965, and that he knew and understood that he was required to do so.[2] The order was the direct result of a continuance initiated by appellant himself, his agreement that September 15, 1965, "would be all right" with him and his specific request that the time on said day be set at 8 a.m. Further, appellant's subsequent conduct in seeking a continuance and then sending Jackson in his place, attest to his knowledge that he had been ordered to appear on September 15, 1965.

Appellant did not personally appear as ordered; his excuse was that he went to Washington, D.C., on September 14, 1965, on an "emergency" in an attempt to obtain a bank charter for his group to prevent another race riot in Los Angeles. Appellant's credibility in this connection having been completely destroyed by other witnesses—some his own—Judge Nebron rejected his testimony concerning the urgency of his trip as unworthy of belief. In any event, says appellant, the record shows that he complied with the order; that following the established custom of one lawyer to send another to appear for him in a case, he sent Jackson "who was in possession of sufficient knowledge concerning the case to proceed." We are unaware of any custom or acceptable practice consisting of an informal arrangement between the secretary of a lawyer representing a defendant in the course of a criminal trial, and another lawyer who knows nothing of the client or the case, whereby the second lawyer without any knowledge that a trial is in progress appears in court for the first, without either the knowledge or consent of the client, such

---

[2]Similar orders were upheld in *Arthur* v. *Superior Court,* 62 Cal.2d 404 [42 Cal.Rptr. 441, 398 P.2d 777], *Chula* v. *Superior Court,* 57 Cal.2d 199 [18 Cal.Rptr. 507, 368 P.2d 107, 97 A.L.R.2d 421], and *Lyons* v. *Superior Court,* 43 Cal.2d 755 [278 P.2d 681]; appellant did not appear at all on September 15, 1965, while in *Lyons,* counsel was late, in *Arthur* counsel was late then absented himself from the courtroom and in *Chula* counsel sent another attorney to appear on a motion.

arrangement having been made by the secretary with full knowledge that the court would grant no continuance of the trial, had not authorized an appearance therein by another lawyer and would require the first lawyer to appear personally. Moreover, the invalidity of appellant's argument is demonstrated by Jackson's statements to Judge Nebron at the time he appeared admitting in effect that indeed he was not ''in possession of sufficient knowledge concerning the case to proceed.'' For all practical purposes, the appearance of Jackson was the same as no appearance at all; its sole effect was to leave appellant's client without representation in the middle of a criminal trial and prevent its orderly conclusion. Nor, as appellant suggests, had respondent Court through its clerk created any reasonable basis for him to believe that he had been excused from personally appearing on September 15, 1965, and could send another lawyer. Directly contrary is the testimony of the clerk, Reverend Dawkins and even appellant's secretary who admitted that the clerk told her he would have to appear, was not excused and no one could appear for him. In any event, how could appellant have believed from his secretary's conversation with the clerk that he had been excused, when his secretary told no one of her conversation with the clerk; she testified that she never reported the conversation to *anyone*.

Appellant's ability to comply with the order is demonstrated by his own testimony that instead of remaining in Los Angeles to be available for a resumption of Powers' trial on September 15, 1965, he chose to place himself outside of the jurisdiction of the court by going to Washington, D.C., the day before in the hope of obtaining a bank charter for a group he represents; this he did wilfully and intentionally, for he admitted that if he was successful he anticipated that he would hold stock in the bank, become chairman of the board of directors and be retained as the bank's lawyer. For his own personal advantage, by a deceit practiced on the court, appellant deliberately abandoned his client in the middle of a criminal trial in favor of a more lucrative representation elsewhere. Reverend Dawkins and Reverend Brookins discredited appellant's claim of ''emergency'' requiring him to go to Washington on September 14, 1965, to prevent another race riot; it is clear that the urgency, if any existed, was to obtain the charter to promote his own selfish financial and personal interests. As an officer of the court, appellant not only deliberately violated a court order and

thereby wilfully obstructed and interfered with the orderly process of a criminal trial in respondent Court and deprived other waiting litigants of prompt hearing, but as a member of the Bar acted in total disregard of his duties to his client leaving him stranded without representation, requiring a continuance of his trial, and imposed on a brother lawyer with complete indifference to the latter's professional reputation.

Appellant's argument that the proceeding should have been initiated by affidavit or order to show cause presupposes that his acts constituted indirect contempt; he gives no reason for his suggestion that the act described in each count in the Findings and Order is not a direct contempt.

The procedure for direct contempt where the facts are within the knowledge of the court is summary and requires no affidavit or formal accusation. (*Curran* v. *Superior Court,* 72 Cal.App. 258, 264 [236 P. 975].) "When a contempt is committed in the immediate view and presence of the court . . . it may be punished summarily; for which an order must be made, reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed." (§ 1211, Code Civ. Proc.) When the contempt is not committed in the immediate view and presence of the court, an affidavit of the facts constituting the contempt must be presented to the court. This "contemplates a situation in which virtually none of the facts involved in the alleged contempt have occurred in the judge's presence but have arisen entirely outside the courtroom." (*Arthur* v. *Superior Court,* 62 Cal.2d 404, 408 [42 Cal.Rptr. 441, 398 P.2d 777].) An attorney's absence from the court in violation of an order to appear, as set up in count II, is a direct contempt; all the relevant facts constituting the contempt occurred when he failed to appear, and the burden of offering an appropriate excuse is on him. (*Chula* v. *Superior Court,* 57 Cal.2d 199, 203, 207 [18 Cal.Rptr. 507, 368 P.2d 107, 97 A.L.R.2d 421] ; *Lyons* v. *Superior Court,* 43 Cal.2d 755, 760 [278 P.2d 681] ; *Arthur* v. *Superior Court,* 62 Cal.2d 404, 408 [42 Cal.Rptr. 441, 398 P.2d 777].) "Where counsel fails to appear, however, the offensive conduct, to wit, the absence, occurs in the presence of the court. Thus, when an absent attorney reappears in the courtroom, due process should be satisfied if the judge confronts him with the charge and offers him a reasonable opportunity to explain." (*Arthur*

v. *Superior Court,* 62 Cal.2d 404, 409 [42 Cal.Rptr. 441, 398 P.2d 777].)

In what can hardly be called an argument, appellant cites numerous cases in support of the claim that his deliberate misrepresentation to the court in its immediate presence and view does not constitute direct contempt. Had appellant bothered to read the cases cited by him he would have discovered his erroneous citations. the nonexistence of one case cited by him in 232 A.C.A. 868, and the subsequent Supreme Court opinion therein reported in 62 Cal.2d 487 [42 Cal.Rptr. 594, 399 P.2d 50] (*Inniss* v. *Municipal Court*) and the distinction between those cases and the instant one. None of his authorities relates to a wilful misrepresentation, in fact, *Gallagher* v. *Municipal Court,* 31 Cal.2d 784 [192 P.2d 905] (erroneously cited at 31 Cal.App.2d 784), relied upon by appellant holds that counsel's good faith insistence on the right to act in a proceeding, although he was legally in error, is not a contemptuous act, ''provided of course, that he does not resort to deceit or to wilful obstruction of the orderly processes'' (p. 788); and none is in the least similar to, or controls our determination here. The facts relating to count I are related in the Findings and Order as occurring in the immediate view and presence of the court. They are supported by reporter's transcripts of the material proceedings in *People* v. *Powers* in respondent Court.

Exhibit M shows that on September 13, 1965, in open court and in its immediate view and presence during the course of a trial, and in an endeavor to secure an advantage by means of falsity, appellant deliberately and wilfully stated as a fact that he was required to be in Chicago the next day (September 14, 1965), representing that he would fly to Chicago and return on September 14, 1965, and that September 15, 1965, ''was all right'' with him for resumption of the *Powers* trial; that relying thereon the judge granted the continuance and ordered him to return on September 15, 1965. The wilful misrepresentation made to secure an advantage occurred in the immediate presence of the court; the fact that the judge did not know that the representation was false until the next day (September 14, 1965), by virtue of a communication between appellant's office and respondent Court, and on September 15, 1965, when appellant failed to appear, does not render the act of wilful misrepresentation any less a direct contempt. On September 14, 1965, between 3 and 3:30 p.m., when appellant, according to his representation to the judge,

was required to be in Chicago, his secretary telephoned the clerk; the judge learning of the call stood near by, and to him the clerk repeated the statements of appellant's secretary, in turn reporting the judge's instructions to her; appellant's secretary said, ''that Mr. Vaughn wanted a continuance'' in *Powers* from September 15, 1965, and ''wanted to know if the case could be continued because he was going or going to go to Washington, D.C.''; when refused a continuance, and told ''that Mr. Vaughn would have to make the appearance,'' appellant's secretary said, ''Oh, dear, I think he has already gone''—''actually gone a few hours ago''; then the clerk told her that no one could appear for appellant and he ''had to be 'here' the next morning'' (Exh. Q). On September 15, 1965, appellant failed to appear for Powers' trial as ordered; Jackson, who appeared for him, told the judge that the week prior, appellant told him he would need him Tuesday, September 14, and perhaps Wednesday, September 15, asking him to be present to ask for a continuance and appear for him in another court. Upon instructions by the judge, the clerk called appellant's office; appellant's secretary stated, ''He [appellant] was called to Washington, D.C., . . . regarding a national bank'' and ''he left about 10 o'clock yesterday [September 14] and would be back on Friday [September 17].'' (Exh. M.) Thus, within 48 hours of appellant's wilful misrepresentation, sufficient facts pointing to the falsity of appellant's statement were brought to the direct attention of respondent Court, in the course of official proceedings in *People* v. *Powers*, by appellant's representatives and by appellant's failure to appear as ordered. Here, too, the relevant facts constituting a contempt occurred in the presence of the court and were within the knowledge of the court; the burden of offering an appropriate explanation was on appellant.

Appellant completely ignores the reporter's transcripts of the numerous hearings in respondent Court in claiming that he was not cited, informed of the charges or advised that he had a right not to testify. At the outset, on September 29, 1965, when appellant telephoned the clerk for a continuance of *Powers*, the latter, upon the judge's direct instructions, advised him that the court was ''reserving jurisdiction in this matter to issue a possible contempt citation,'' there would be two cases before the court on September 30, 1965—*Powers* and ''the matter between [respondent] court and George L. Vaughn as an officer of the court''—and the judge would discuss it with him the next morning. On September 30, 1965,

when appellant appeared, the judge again advised him of the contempt proceedings because of his represented trip to Chicago on September 14, 1965, and his failure to appear on September 15, 1965, as ordered. Upon the conclusion of *Powers*, the judge advised appellant—that the court was reserving jurisdiction ''to get into a contempt proceeding''; told him of the charges; recited the circumstances of his representation that he was required to be in Chicago and the facts relating to his failure to appear on September 15, 1965; and said that he had told ''several conflicting stories'' and wanted to hear from him in detail. Then the judge stated: ''Obviously, *this is a quasi-criminal matter,* and *I don't want you to do anything that in any way will incriminate yourself.*'' Having ''some reason to disbelieve the representations that were made'' by appellant, the judge told him he ''would like to certainly have some corroboration other than the specific representation you make,'' such as reservations, planes, appointments, etc.; ''but *that is entirely up to you* to furnish what you feel would be the proper matters for the court to consider.'' The court advised appellant, ''I want you to have ample time to think this matter out''; and set the contempt hearing for October 13, 1965.

On October 13, 1965, at 8 :19 a.m., court convened and the judge advised appellant of the purpose of the hearing and the nature of the charges, reciting the circumstances material to each; then said, ''I want to know exactly, *if you care to tell the court,* what happened during and around this period of time [September 14-15, 1965] . . . Mr. Vaughn, *if you care* at this time to step forward and be sworn, I would like to hear from you. . . .'' He directed appellant's attention to matters of concern to him and detailed what he would like to have explained. After several reporter's transcripts (*People* v. *Powers,* September 13, 15, 29 and 30, 1965) had been received in evidence and given to appellant, the court ordered copies of the transcript of the then hearing to be given to him; then appellant asked the judge ''. . . May I be sworn?'' and he was. His testimony consisting of almost 90 pages of transcript, continued until 11 :50 a.m. when the hearing was continued to permit appellant to bring in his secretary and office records.

On December 22, 1965, when court convened at 9 a.m., appellant was again advised by the judge of the charges; during the ensuing extended discussion between appellant and the court, he acknowledged that he understood the nature

of the proceedings and the charges. Confronted with the Docket in *Sibley* and the established fact that there was no pretrial hearing on September 14, 1965, appellant was then given another opportunity to explain; he took advantage of it and again testified. Appellant offered witnesses and his records. The hearing adjourned at 3:45 p.m.; it is contained in 147 pages of transcript.

In all hearings appropriate procedure was followed. ▮ Due process was satisfied when Judge Nebron notified appellant he was being cited, advised him of the charges and offered him a reasonable opportunity to show why he should be excused for his wilful misrepresentation to the court and his failure to appear as ordered. ▮ In the absence of arbitrariness on the part of Judge Nebron and with the showing that a reasonable and ample opportunity was afforded appellant to explain the reasons for his absence and his misrepresentation, this court will not annul the contempt proceedings against him. (*Arthur* v. *Superior Court*, 62 Cal.2d 404, 407, 409 [42 Cal.Rptr. 441, 398 P.2d 777].) The lengthy record before us speaks eloquently of the great care used by the judge at every step of the proceedings to give appellant a fair hearing. While the judge did direct appellant into areas which concerned him and about which he wished an explanation, this constituted no "order" to testify. Appellant was invited to take the stand if he cared to do so but was never told to testify. Nothing in the record suggests that his testimony was not voluntarily given; to the contrary, it demonstrates not only his willingness but his anxiety to testify to clear himself of the charges. ▮ Having voluntarily and without objection testified in an effort to exonerate himself, and having failed to do so, he has waived his right to object for the first time on appeal. (*People* v. *Almond*, 239 Cal.App.2d 46, 50 [48 Cal.Rptr. 308].) ▮ How can an experienced lawyer, under these circumstances, who considered himself well enough qualified to represent literally hundreds[3] of persons charged with a variety of serious felonies (murder, burglary, assault with a deadly weapon and a myriad of crimes arising out of the Watts' riot) now, in good faith, make the claim that since "there was no statement to the citee of constitutional rights as is required by the cele-

---

[3]The record shows that appellant had so many criminal cases pending that he was constantly harassed because of conflicting hearings and trials and spent much effort and time "juggling" court dates and "sandwiching" hearings between trials.

brated case of *Esconbedo* v. *Illinois* [*sic*] [378 U.S. 478 (12 L.Ed.2d 977, 84 S.Ct. 1758)] and *the Derodo* [*sic*] [*People* v. *Dorado*, 62 Cal.2d 338 (42 Cal.Rptr. 169, 398 P.2d 361)] decision,'' he did not know of his constitutional rights. Inherent in those cases, with which he has had so much experience and in which he has represented and advised those accused, are all of the constitutional questions applicable to persons charged with criminal offenses. As to counsel, appellant had ample opportunity to obtain a lawyer; he elected not to do, so and proceeded without one until after his adjudication in contempt when he appeared with his present counsel for sentence on January 27, 1966, to plead for leniency.

Appellant's exception to the failure of Judge Nebron to disqualify himself is not well taken; charged with the commission of a direct contempt, appellant could not urge his disqualification. ▮ ''In a direct contempt, that is a contempt in the immediate presence of the court, the judge in whose presence the contempt was committed possesses the constitutional power to punish the offender summarily. [Citations.] Such power is necessary to preserve the integrity of the court. In such a case no question of the disqualification of the judge affronted by the direct contempt can arise. The necessities of the case require that the affronted judge preside.'' (*Turkington* v. *Municipal Court*, 85 Cal.App.2d 631, 635-636 [193 P.2d 795]; *Briggs* v. *Superior Court*, 211 Cal. 619, 630 [297 P. 3]; *Blodgett* v. *Superior Court*, 210 Cal. 1, 10 [290 P. 293, 72 A.L.R. 482].) Moreover, the record fails to show any partiality or prejudice on the part of the judge simply because there was a conflict between the testimony of appellant's secretary and his clerk. In any event, the conflict was immaterial for appellant's secretary testified that she never reported to anyone her conversation with the clerk. As to the judge's statements concerning the credibility of Reverend Brookins, Judge Nebron expressed equal regard for appellant's witness Reverend Dawkins.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 4, 1967.