313 So.2d 777 (1975)
STATE of Florida ex rel. GORE NEWSPAPERS COMPANY and Margaret Ann Croxton, Relators,
v.
The Honorable Robert W. TYSON, Jr., Circuit Court Judge, Respondent.
No. 74-1533.
District Court of Appeal of Florida, Fourth District.
May 16, 1975.
Rehearing Denied July 2, 1975.
*778 Theodore R. Hainline, Paul R. Regensdorf and Jeffrey P. Sprowls, of Fleming, O'Bryan & Fleming, Fort Lauderdale, for relators.
Robert L. Shevin, Atty. Gen., Tallahassee, and Thomas M. Carney and Basil S. Diamond, Asst. Attys. Gen., West Palm Beach, for respondent.
Hugo L. Black, Jr., of Kelly, Black, Black & Kenny, P.A., Miami, as amicus curiae.
Cromwell A. Anderson, Miami, and Hugh Glickstein, Lauderhill, as amicus curiae.
MAGER, Judge.
This is an original prohibition proceeding instituted by Gore Newspapers Company, a newspaper corporation, and Margaret Ann Croxton, Relators, seeking to restrain and prohibit the Honorable Robert W. Tyson, Jr., Circuit Judge of the 17th Judicial Circuit, State of Florida, from conducting a closed trial in a dissolution of marriage proceeding pending before that court.
The facts as set forth in the affidavit of Margaret Ann Croxton, relator, and the briefs of the parties herein, reflect that on November 4, 1974, respondent was in the process of conducting a dissolution proceeding in the case of Jackie Gleason v. Beverly Gleason, No. 74-11440, to be heard *779 in chambers. The relator Croxton, a news reporter employed by relator Gore Newspapers Company, sought to attend, observe and report the particular judicial proceeding; however, she was advised that the proceeding was closed to the public and press.
It appears that at the outset of the hearing in respondent's chambers, Mrs. Gleason's attorney moved to exclude the public from the hearing and from access to the files in order to protect her privacy which motion was joined in by Mr. Gleason's attorney. Having ascertained that both parties requested the exclusion of the public from the trial and from access to the file, the court announced that the trial would be closed to the public and press and that no newspaper reporters or other members of the public would be allowed to attend and observe the proceedings.
A closed trial was thereafter conducted in chambers.
On November 5, the relator Croxton was advised by the respondent that the proceedings would resume on December 3, 1974, and on that date the trial would again be closed to the public and press. As a result of having been excluded from these proceedings, the relator Croxton and relator Gore Newspapers filed a suggestion for the issuance of a writ of prohibition. (See sec. 81.011, F.S.) On November 13, 1974, this court issued an order directing the respondent to show cause why the relief prayed for by the relators should not be granted.[1] Permission was granted for the filing of separate amicus briefs on behalf of Jackie Gleason and Beverly Gleason.
In an effort to expedite the prohibition proceeding and to minimize the delay to the litigants in the dissolution action, the court directed that all briefs and responses be filed on short notice and accelerated the date for the hearing of the oral argument.
The precise question raised in this prohibition proceeding is one of first impression in this state and the nation: whether a trial court in the conduct of a civil (dissolution) proceeding has the authority to exclude the public and press and conduct a closed door trial upon request of the parties to the litigation.
Implicit in the consideration of this question is the necessity to recognize and maintain the delicate balance between competing rights and interests  the inherent power and interest of the court in guaranteeing to the litigants the fundamental right to a fair trial when measured against the right and interest of the public and press to have access to all judicial proceedings. These rights and interests have received extensive consideration by the courts. But, the great bulk of the litigation in this area has concerned the rights of the public, the press and the defendant in criminal proceedings. Nevertheless the comments, discussions and observations in these cases are extremely instructive to the question posed. See, in particular, United States v. Dickinson, 5 Cir.1972, 465 F.2d 496.
The question therefore presents tripartite considerations: the power and authority of the court; the rights and interests of the litigants in the civil dissolution proceeding; and the rights and interests of the public and the press.
The complexity of the problems presented by this question is further compounded by the additional consideration of the threshold proposition of the propriety of prohibition. In State ex rel. Gerstein v. Baker, Fla.App. 1971, 243 So.2d 464, the Third District Court discussed several of the general principles pertaining to the application of the prohibition remedy:
"Prohibition is a prerogative writ by which a court having appellate and supervisory *780 jurisdiction over an inferior court or tribunal may prevent the latter from usurping or exercising a jurisdiction with which it has not been invested by law. The writ may be employed to restrain exercise by the inferior court of jurisdiction which it does not possess, or to restrain action which is in excess of jurisdiction possessed. Prohibition is not to be employed as a substitute for appeal or certiorari, but may be invoked, for the purposes defined, in the absence of those or another adequate remedy." (Emphasis added.)
Of particular importance are the underlined phrases of the above quoted statement. In this regard, the judicial action complained of must be shown to be in excess of the court's subject matter jurisdiction in the particular case, i.e., although the trial court would have jurisdiction over the subject matter of the pending (dissolution) proceeding, nonetheless if it takes an action or enters an order characterized as being unauthorized by law, such action or order may be said to be in excess of the court's jurisdiction over the cause for which prohibition may lie. It is to be noted that utilization of prohibition is in the disjunctive, i.e., to restrain the exercise of jurisdiction which the inferior court does not possess or to restrain action which is in excess of jurisdiction possessed. State ex rel. Gerstein v. Baker, supra. The former category is, somewhat, inflexible, i.e., either the court has jurisdiction or it does not; but the latter would certainly be dependent upon varying particular circumstances.
In reviewing cases analyzing the propriety of prohibition no mention is made regarding whether the "excessive" act was within the general range of the court's discretion so as to characterize the act as merely being "erroneous" and, hence, subject to some type of review other than prohibition. From the very nature of the proposition of "exceeding jurisdiction possessed" is the recognition that in some instances the court's action may be excessive whereas in some instances it may not be. In either instance the court's action may be the result of an exercise of discretion; but it is no less susceptible to prohibition if the action is unauthorized by law. Whether a court exceeds its judicial power is a proper subject of a prohibition proceeding. Scussel v. Kelly, Fla.App. 1963, 152 So.2d 767, vacated on other grounds 167 So.2d 870 (Fla. 1964); see also, State ex rel. Miami Herald Publishing Co. v. Rose, Fla.App. 1972, 271 So.2d 483. Any other interpretation of the availability of the writ of prohibition would result in prohibition being limited strictly to the court's jurisdiction over the subject matter. See State ex rel. McGreevy v. Dowling, Fla. App. 1969, 223 So.2d 89, 93.
Since it is beyond dispute that the trial court had jurisdiction over the general subject matter, the respondent's action (in conducting a nonpublic trial) must be examined in light of whether such action was beyond the power of the court to enter under the particular circumstances.
It is generally recognized that the writ of prohibition, being an extraordinary writ, cannot be resorted to when other remedies at law are available. 25 Fla.Jur., sections 8 and 9. But the mere existence of another remedy does not in itself preclude the prohibition remedy; the test is whether the other legal remedy is plain, speedy and adequate in the circumstances of the particular case. 25 Fla.Jur., supra, sec. 9. See also Scussel v. Kelly, supra.
Under these circumstances we find that prohibition is a proper remedy.
The fact that the relators are not parties to the proceedings below would preclude them from seeking ordinary appellate review of the respondent's order. It is axiomatic that only a party to a proceeding has the standing to seek appellate review. To suggest the availability of intervention as a party in the proceeding below as an "adequate" remedy to preclude prohibition is to *781 unnecessarily encumber pending litigation and invite the entry of "nonparty-parties" when the right or interest sought to be enforced is not directly involved in the subject matter of the pending proceeding.
Decisions rendered by our sister states have recognized the propriety of extraordinary remedies, such as prohibition, as a means of challenging the action of a court alleged to be acting in excess of its jurisdiction particularly where the movants are not parties to the proceeding from which the trial action emanated. E.W. Scripps Company v. Fulton, 1955, 100 Ohio App. 157, 125 N.E.2d 896; Phoenix Newspapers, Inc. v. Superior Court, 1966, 101 Ariz. 257, 418 P.2d 594; Kirstowsky v. Superior Court, 1956, 143 Cal. App.2d 745, 300 P.2d 163.[2] The Scripps case is particularly significant because of the similarity of those circumstances to the instant case. There, prohibition was sought by a newspaper corporation on behalf of its reporters and the general public to restrain the trial judge from enforcing an order excluding relators and the public from the court room over which the judge was presiding during the progress of a criminal proceeding. The Court of Appeal held that the parteis were entitled to maintain prohibition proceedings. See also Phoenix Newspapers, Incorporated v. Jennings, 1971, 107 Ariz. 557, 490 P.2d 563.
Concluding, as we do, that relators have the proper standing to maintain a writ of prohibition we now turn to the consideration of the precise question posed by this proceeding. At the outset we would hasten to point out that the question presented does not directly involve freedom of the press; although pragmatically it must be recognized that if the press is excluded from a judicial proceedings it is unable to print and disseminate that which it deems newsworthy. In 49 A.L.R.3d 1007, annotation: "Rights of Accused  Exclusion of Press", the textwriter observes, at p. 1013:
"... In a larger sense, freedom of the press loses some of its effectiveness when the press is denied access to information, and such a restriction should therefore be allowed only where other fundamental interests require it. Furthermore, it should be noted that such restrictions on access to information may force the media to gain information by other means which may be even more deleterious to the aim of the restriction... ."
What is directly involved is the power and authority of a court to conduct a closed civil trial and ban public access to a judicial proceeding based solely upon the expressed desires of the litigants in that proceeding.
In regard to the first of the tripartite considerations, we would reaffirm the basic proposition that a court possesses the inherent power to control the conduct of the proceeding before it. 8 Fla.Jur., Courts, sec. 40. This power exists apart from any statute or specific constitutional provision and springs from the creation of the very court itself; it is essential to the existence and meaningful functioning of the judicial tribunal. People v. Hinton, 1972, 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (cert. den. 410 U.S. 911, 93 S.Ct. 970, 35 L.Ed.2d 273); State v. Lawrence, Iowa 1969, 167 N.W.2d 912; Des Moines Register and Tribune Co. v. Hildreth, Iowa 1970, 181 N.W.2d 216; Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); In re Hearings Concerning Canon 35 Colo. 1956, 296 P.2d 465; Kirstowsky v. Superior Court, supra; In *782 re Shortridge, 99 Cal. 526, 34 P. 227 (1893); People v. Jelke, 1954, 308 N.Y. 56, 123 N.E.2d 769; see also, Brumfield v. State, Fla. 1958, 108 So.2d 33; Robertson v. State, 64 Fla. 437, 60 So. 118 (1912); cf. 49 A.L.R.3d 1007, supra; 48 A.L.R.2d 1436.
In controlling the proceeding before it, it is within the inherent power of the court to preserve order and decorum in the court room, to protect the rights of the parties and witnesses and generally to further the administration of justice. People v. Hinton, supra; see also Brumfield v. State, supra, and Robertson v. State, supra. In furtherance of the foregoing, there are numerous cases recognizing the power of the court to exclude the public and the press. See A.L.R. Annotations and cases hereinabove set forth. A review and analysis of these cases will reflect the existence of cogent reasons for such exclusion all primarily concerned with guaranteeing the parties a fair and an impartial trial.[3]
The public and press have been excluded in such instances where the testimony of the defendant or witnesses was of such a nature that it could not be freely and completely presented to the public without serious detrimental effects to the "fair trial" concept, Kirstowsky v. Superior Court, supra; where the nature of the testimony was such as to be offensive to younger persons, E.W. Scripps Company v. Fulton, supra, and People v. Hinton, supra; where the lives and safety of witnesses were involved, People v. Hinton, supra; United States v. Slocum, 3 Cir.1972, 464 F.2d 1180.
It is impossible to catalog every instance where exclusion is justified; it must depend upon the particular factual circumstances measured by a consideration of the various interests affected. Suffice it to say  the power to exclude exists.
The inherent power of the court to control the conduct of its own proceedings is not limited to criminal proceedings although most of the pronouncements regarding the exercise of this power have been made in criminal cases. A civil litigant is no less entitled to a fair and an impartial trial than a defendant in a criminal case; and where necessary, the court in furtherance of the litigants' right to a fair trial may exclude the public and press in circumstances not unlike those found in criminal proceedings  but then only for the most cogent reasons.
Civil litigation involving trade secrets is a recognized instance where the public and the press may be excluded. See Annotation: Trial  Safeguarding Trade Secrets, 62 A.L.R.2d 501.[4] The Florida legislature has recognized that certain proceedings ought to be subject to judicial control insofar as exclusion of the public and press is concerned.[5] This exclusion rests within the sound discretion of the court except in adoption proceedings where the legislature has specifically declared that such hearings should be held in closed court (and the file not subject to inspection except upon order of the court). See Section 63.162, F.S.
Unquestionably, where it is necessary to maintain order and decorum in a *783 civil proceeding the court has the inherent power to exclude the public. The same inherent power would exist in a civil proceeding with respect to other circumstances as, for example, where the testimony of a child is involved in a domestic relations case, which, to the satisfaction of the court, cannot otherwise be presented except in chambers.[6] As indicated in People v. Hinton, supra, the public has been excluded when the exhibition of certain evidence was offensive; where the witnesses would be embarrassed or a scandalous trial would affect any persons; or a witness would thereby be unable to testify as to the material facts of the case.
The point is simply, there is no distinction between a criminal or a civil action insofar as it pertains to the exercise of the court's inherent power to control the conduct of the proceedings before it; but, whether it be a criminal or a civil proceeding this power must be exercised cautiously and only for the most cogent reasons.
In the instant situation the court completely excluded the public and press not because the case presented some valid reasons within the well recognized exceptions but based solely upon the wishes of the parties. No theory was advanced that the parties could not be accorded a fair trial if the public and press were present or that the administration of justice would be furthered by this exclusion. The litigants presented no reasons, cogent or otherwise, for requesting that their proceedings be conducted behind closed doors. However well intentioned the judge's motives may have been in acceding to the wishes of the litigants, it simply could not afford a sufficient predicate upon which to exclude the public and press.[7]
The rights of litigants in any civil proceeding (including a dissolution proceeding) are certainly not to be cavalierly treated or arbitrarily disregarded. As pointed out in Scripps, supra, at 903:
"... The courts must be conducted in the interests of maintaining liberty under law. The litigants are the first consideration of the court and the judge may enforce reasonable rules to afford complete court room decorum and prevent any and all activities not directly connected with the trial which would in the slightest distract the attention of those engaged in the proceedings."
The court's primary concern is for the litigants and in particular for their fundamental right to a fair trial. But the personal preference of litigants and a fair trial for litigants are two entirely different considerations.
Even though litigants may prefer to have their dissolution proceeding conducted in private away from the prying eyes of the public and glare of the media, *784 these desires cannot serve as a sufficient predicate upon which to exclude the public and press completely. The courts belong to the people; "they have been established by the people for the administration of justice according to law and are not to be considered as the private domain of any person or group of persons." Scripps, supra, at 909.
Marriage and dissolution proceedings are unique in the particularity that the state has a continuing interest in perpetuating the marital relationship as well as in regulating dissolution proceedings. Dissolution is a right conferred by statute predicated upon the belief that the state's welfare will be promoted thereby. 24 Am.Jur., 2d, Divorce and Separation. Since the adoption of the first divorce statute in this state through and including the new no-fault dissolution of marriage law, the legislature has significantly omitted from its enactments any pronouncements that dissolution proceedings should or may be conducted in private. Although some states have adopted statutes which have expressed a public policy in favor of closed dissolution proceedings, Florida has not chosen this route. See McKinney's Consolidated Laws of New York, Chap. 30, Art. 2, sec. 4; see also Supplement to Wigmore on Evidence, 3d ed., vol. 6, sec. 1835.
While Florida's public policy may suggest that these hearings be open to the public and press, the absence of a statute would not diminish the inherent power of the court under proper circumstances to conduct a domestic relations trial in private. But the fact that the Florida legislature has not so spoken on this subject would seem to demonstrate the necessity of presenting cogent reasons for conducting a closed-door dissolution hearing.
Indeed, whenever litigants utilize the judicial processes they place themselves in the position where the details of their difficulties will invariably be made public. It is sometimes felt that this is too high a price to pay for living in a civilized society, particularly when measured against a person's right to privacy. Cf. Harms v. Miami Daily News, Inc., Fla.App. 1961, 127 So.2d 715. But every right is not absolute to the point of inflexibility; some rights must bend and give way to other rights in certain instances. The right to one's privacy may be secondary to public access to the courts not only by virtue of utilization of the judicial tribunal, but by an additional consideration  that the individuals involved in the proceeding are public figures whose lives and activities may be deemed to be a matter of public interest. It has been generally recognized that a person who by his accomplishment, fame or mode of life or by adopting a profession or calling which gives the public legitimate interest in his doings, affairs and character may be said to be a public personage and thereby relinquishes at least a part of his right to privacy. 62 Am.Jur.2d sec. 21; Sidis v. F-R Pub. Corporation, 2 Cir.1940, 113 F.2d 806; see also Harms v. Miami Daily News, supra, and Firestone v. Time, Inc., Fla. 1972, 271 So.2d 745.[8] As aptly observed in Berg v. Minneapolis Star & *785 Tribune Co., U.S.D.C. Minn. 1948, 79 F. Supp. 957, 961:
"Moreover, it cannot be controverted that there is a wide-spread interest in this very kind of news and perhaps it is not strange that it should be so. Most people are interested in the weather because it generally concerns all classes of people. Domestic disputes, controversies between parents and others as to the custody of minor children, allowances of alimony, and the various acts and conduct recognized by the courts as grounds for divorce, are probably of interest to a large number of people because in their own immediate lives, to a greater or less degree, such problems have concerned their friends and acquaintances and sometimes their own immediate families. And as recognized by the eminent writers from whom the doctrine of the right of privacy stems, `it is only the more flagrant breaches of decency and propriety that could in practice be reached, and it is not perhaps desirable even to attempt to repress everything which the nicest taste and keenest sense of the respect due to private life would condemn.' p. 216, 4 Harvard Law Review."
Sidis v. F-R Pub. Corporation, supra; cf. Gibson v. Maloney, 231 So.2d 823 (Fla. 1970), cert. den. 398 U.S. 951, 90 S.Ct. 1871, 26 L.Ed.2d 291.
Certainly this is not to suggest that every divorce proceeding is deemed a matter of great public interest and concern or that every public person's dissolution proceeding is beyond control of the court; but, rather, that these are factors to be considered by the court in closing the court room to the public particularly where, as here, the only reason advanced are the personal wishes of the litigants. Even the request of a defendant in a criminal case that his trial be closed has been held to be an insufficient predicate when measured against the public interest. Scripps, supra; 49 A.L.R.3d 1007, supra; Kirstowsky, supra; but see, United Press Associations v. Valente, 1954, 308 N.Y. 71, 123 N.E.2d 777.
The conduct of any trial, whether it be criminal or civil, is a public matter. As observed by the Supreme Court of the United States in Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, at p. 1254:
"A trial is a public event. What transpires in the court room is public property... . There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire proceedings before it."
The public and press have a right to know what goes on in the court room whether the proceeding be criminal or civil. The Supreme Court of California in an 1893 decision significantly observed:
"... In this country it is a first principle that the people have the right to know what is done in their courts. The old theory of government which invested royalty with an assumed perfection, precluding the possibility of wrong, and denying the right to discuss its conduct of public affairs, is opposed to the genious of our institutions, in which the sovereign will of the people is the paramount idea; and the greatest publicity to the acts of those holding positions of public trust, and the greatest freedom in the discussion of the proceedings of public tribunals that is consistent with truth and decency, are regarded as essential to the public welfare. Therefore, when it is claimed that this right has in any manner been abridged, such claim must find its support, if any there be, in some limitation expressly imposed by the lawmaking power, or the right to exercise the authority claimed must be necessarily implied as essential to the execution of the powers expressly conferred... ." In re Shortridge, 34 P. 227, 228, 229.
*786 In his treatise on the law of evidence, Professor Wigmore significantly discusses the necessity for and beneficial aspects of maintaining free public access to the court room: (1) The public proceeding tends to improve the quality of testimony and thereby promotes the quality of justice, e.g., subjectively, it produces in the witness' mind a disinclination to falsify and objectively, it secures the presence of those who may possibly be able to furnish testimony to contradict a potential falsifier; (2) in "acting under the public gaze" officers of the court including judge, jury, counsel and witnesses, "are more strongly moved to a strict conscientiousness in the performance of duty", e.g., secret tribunals have exhibited abuses which have been wanting in courts whose procedure are public; (3) persons not directly involved in the pending litigation may think they might be affected and may seek to protect themselves accordingly and under such circumstances "they have a right to be present for the purpose of hearing what is going on"; (4) from an educational standpoint there are material advantages to be gained by public attendance, e.g., "not only is respect for the law increased and intelligent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy." 6 Wigmore on Evidence, sec. 1834 (3d ed.).[9]
To suggest an exclusion of the public and the press from a civil (or a criminal proceeding) on the ground that those who attend come only because of idle or morbid curiosity is a gossamer argument when measured against the necessity and reasons for having open proceedings. The motivation for the presence of the public and press ought not to be the determinative factor for exclusion no more so than the motivation for casting a vote in an election would serve as a factor in prohibiting the public from exercising the right to vote. It is not the public's reason for attending but rather the public's right to attend that is to be evaluated.[10]
While we find no specific constitutional or statutory provision speaking directly to the right of the public to attend a judicial proceeding (as distinguished from the right of every person to seek redress in the courts and the right to a public trial in a criminal proceeding as specifically stated in Sections 16 and 21, Declaration of Rights of the Florida Constitution), the "open court" concept is an indispensable part of our system of government and our way of life. See also Wigmore, supra, sec. 1834. As pointed out in Scripps, supra, at 900:
"... The basis of the constitutional guarantee of an `open court' is to be found in the development of the common law and would be a recognized right of the people without constitutional sanction."
Public access to the courts is as fundamental as the litigant's right to a fair trial  hence the conflict and the inevitable balancing of rights and interests.
In recognizing the right of the public to have access to its courts subject to certain limitations as heretofore mentioned, implicitly we recognize that the press is entitled to the same right. As was pointed out in Kirstowsky, supra, at 169:
"... [the] members of the press are in the same position as other members of the public and have no greater right to be present at court hearings than has any other member of the public."
*787 Cf. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Likewise, the press certainly has no lesser right than any other member of the public under certain circumstances. The court can exclude the public and by so doing it excludes the press. But if the public has access to the courts then so does the press. The mere fact that the individual seeking access to the courts happens to be an employee of a newspaper does not alter his position as a member of the public; the contentions being advanced are no less "on behalf of the public" because at the same time they may be beneficial to the interests of the press.
As stated in Scripps, supra:
"... The rights of representatives of the press can, however, rise no higher and by the same token, can be no less, than the rights of any other member of the public. So long as the means adopted in observing trial events stay within the rules of court and do not distract from or disturb the solemnity of the proceeding which is so necessary in the conduct of a public trial in the administration of justice, the right of an employee of a newspaper is the same as any other person ..." (125 N.E.2d 896, 904).
We see no valid reason why a member of the press or for that matter a newspaper corporation cannot be considered as a representative of the public insofar as enforcement of the public right of access to the court is concerned. See E.W. Scripps Co. v. Fulton, supra; see also Phoenix Newspapers Incorporated v. Jennings, 1971, 107 Ariz. 557, 490 P.2d 563; cf. Orange County Audubon Society, Inc. v. Hold, Fla.App. 1973, 276 So.2d 542.
History past and present has poignantly demonstrated the destructive effect of secrecy on our society  sowing seeds of suspicion and distrust between government and the governed. It would seem somewhat paradoxical for the very institution which has fostered a recognition of government in the sunshine and whose pronouncements are concerned with the administration of justice to take a backward step by enshrouding its own proceedings in secrecy solely to accommodate litigants. See the Judicature, vol. 58, No. 2, August 1974 "Let the Sunshine In: The Case for an Open Judicial System". As observed in Rea v. Rea, supra, "The existence of a back door to the court room, and thus, to the judge's private ear, is abhorrent to our ideas of justice...". Access to the courthouse is and should be through the front door and not through the rear door.
In summary, we hold as follows:
1. A court's action in excluding access to the courts by the public and press is subject to review by prohibition;
2. A newspaper corporation, a newspaper reporter or a member of the public have the standing to maintain a prohibition proceeding for the purpose of enforcing the right of public access to the courts;
3. The court has inherent power to control the conduct of its own proceedings;
4. The court, under its inherent power, may for cogent reasons exclude the public and press from any judicial proceeding to protect the rights of the litigants and to otherwise further the administration of justice;
5. In determining the restrictions to be placed upon access to judicial proceedings, the court must balance the rights and interests of the parties to the litigation with those of the public and press;
6. The type of civil proceeding, the nature of the subject matter and the status of the participants are factors to be considered when evaluating the cogent reasons for excluding the public and press from access to the courts;
7. Persons involved in civil litigation are not entitled to exclude the public *788 and press merely because they request a closed hearing;
8. The public and the press have a fundamental right of access to all judicial proceedings.
9. The court's exclusion of the public and press (and the sealing of court records) based solely upon the wishes of the parties to the litigation, absent cogent reasons for conducting a private trial, constitutes an act in excess of the power of the court.
Writ of prohibition granted.
DOWNEY, J., concurs.
WALDEN, J., dissents, with opinion.
WALDEN, Judge (dissenting):
I respectfully dissent based on these observations:
1. Prohibition does not lie. While the majority in its opinion correctly sets forth the governing principles, it fails to understand and apply them properly. See 25 Fla.Jur., Prohibition, §§ 6, 17, 19, 21, 23 (1959). It holds that the trial court order regulating its courtroom and trial procedures was in excess of the trial court's jurisdiction. This will, or should, come as a shock to the trial judges of this state. While the majority opinion gives lip service to the fundamental notion that trial courts possess the inherent power to control the conduct of trial proceedings, it strangely ignores it in its quest, and apparent determination, to grant relief.
As to jurisdiction, the Supreme Court of Florida as early as 1912, in the case of Robertson v. State, 64 Fla. 437, 60 So. 118 (1912), recognized that the trial court had the power and jurisdiction to regulate and limit attendance of spectators at a trial  and there, more compellingly and different from here, it was a criminal trial with the constitutional mandate for a public trial. More lately, in Coggan v. Coggan, 214 So.2d 368 (2dDCA Fla. 1968), the court recognized the trial court's power to exclude spectators from the courtroom in a domestic relations case  a civil suit, and affirmed, against the objections of a party. Had the court lacked jurisdiction to exclude, its order would have been void. But, the appellate court did not even discuss the subject of jurisdiction, it being obvious the court had jurisdiction.
As the majority applies the "in excess of jurisdiction" threshold, it is a sophistry by which this court can take jurisdiction of any order of any judge with which it disagrees and thereby overule it. The fact that a trial judge makes an erroneous order does not mean that he has acted in excess of his jurisdiction. State ex rel. Pope v. Joanas, 278 So.2d 305 (1stDCA Fla. 1973):
"The cases are legion which hold that prohibition will not lie to test the correctness of a trial court ruling." Id. at 306.
State ex rel. O'Donnell v. Hall, 175 So.2d 792 (2dDCA Fla. 1965):
"The Writ [of Prohibition] cannot be a means of determination of questions involving the correct or incorrect decision of another court in matters in which the court has jurisdiction to act. It will not lie to correct errors of a court which is acting within its jurisdiction, although it may be proceeding improperly in the exercise of that jurisdiction." Id. at 793.
It is too well settled to require extensive citations that prohibition does not lie to restrain a court from committing error or entering an erroneous order so long as it has jurisdiction over the case and subject matter. It simply dumbfounds me to think that a trial judge has no jurisdiction over the courtroom and attendance therein. Even the majority opinion recognizes many instances where the trial court can correctly regulate attendance  but, in this *789 instance, it chooses, because of its disagreement with the trial court use of its power, to say that the trial court has no jurisdiction.
The inconsistency and fallacy of the majority opinion is highlighted in paragraphs 3 and 4 of its summary of holdings:
"3. The court has inherent power to control the conduct of its own proceedings;
"4. The court, under its inherent power, may for cogent reasons exclude the public and press from any judicial proceeding to protect the rights of the litigants and to otherwise further the administration of justice;"
This is a perfectly clear recognition of what I am saying, that the court has jurisdiction. If it has jursdiction, then it has the power and right to exercise it, even mistakenly, and prohibition does not lie. What the majority is saying is that the trial court can exercise such jurisdiction so long as it does so in a way that this court approves  so long as it doesn't err. Thus, we will interrupt at any stage via prohibition to review and see if the trial court reasons are sufficiently "cogent." We will contort prohibition so as to review, midtrial or anytime, to see if we agree with the trial court's evaluation of the factors contained in paragraphs 5 and 6 of the majority's summary of its holdings:
"5. In determining the restrictions to be placed upon access to judicial proceedings, the court must balance the rights and interests of the parties to the litigation with those of the public and press;
"6. The type of civil proceeding, the nature of the subject matter and the status of the participants are factors to be considered when evaluating the cogent reasons for excluding the public and press from access to the courts;"
I strongly feel that the writ is being abused and that it will lead to much future mischief. Here a stranger, without standing or legitimate interest in the civil litigation, complains about a trial court order. What happens? This court stays the suit and thereby frustrates the right of private citizens in gaining access to their courts and a speedy disposition of their disputes. How about the future? I suppose, based on the majority decision, any time the trial court limits attendance at a trial or seals a court filed for whatever reason, anybody  private citizen or corporation (to include a newspaper, television station, etc.)  can simply file a suggestion for writ of prohibition. We call a halt to the trial at whatever stage. If we agree with the order, then we say the trial court had jurisdiction and deny the petition. If we disagree, as here, then we say that the trial court lacked jurisdiction  or as the majority prefers  meaninglessly say that the trial court acted "in excess of its jurisdiction," and grant the petition. Oh, well  perhaps the majority feels that we should enlarge our scope of appellate access by giving prohibition a new frame and dimension. This new departure will surely do it. However, I have found not a single case that makes use of prohibition in the method fashioned by the majority.
2. It should be emphasized that, although one of the relators is a newpaper, it is without dispute that it has no greater or special standing or right to relief than is possessed by any other citizen, private or corporate, in our land. In other words, any busybodies seeking tid bits for bridge table or locker room gossip, would be equally entitled to the same treatment and relief as is awarded by the majority opinion. I assume they would receive it.
And it is to be noted that the majority makes much of the fact, as a basis of granting extraordinary relief, that relators would not otherwise be able to seek appellate review. Indeed! Why should they? Neither could this writer, nor any other person in the United States, since we are not a party to the action. We have no legitimate interest in the Gleason domestic *790 affairs, and their lawsuit affects no public interest or domain. We should not be permitted to intrude, merely to satisfy our curiosity, and thereby deprive them of their valuable right of privacy.
3. As the majority concedes, there is no case law precedent or controlling statute authorizing relief in cases such as this. I suggest that is because no one (and correctly) has ever doubted that the trial court has the discretion to control attendance at civil trials where the parties consented. The majority often cites, makes much of, and draws comfort from a number of criminal cases, such as E.W. Scripps Co. v. Fulton, 100 Ohio App. 157, 125 N.E.2d 896 (1955). See 39 A.L.R.3d 852 (1971) and 49 A.L.R.3d 1007 (1973). However, the distinction between this civil case and those criminal authorities is so manifest that it should not be necessary to mention it. The Sixth Amendment of the United States Constitution and Article 1, Section 16, of the Florida Constitution, provide for public trials in criminal cases, only. Neither can it be seriously urged that the First Amendment of the United States Constitution, or that Article 1, Section 4, of the Florida Constitution, dealing with freedom of the press, has an applicability to these facts. Thus, there is no constitutional provision or statute mandating public trials in civil cases where parties consent to a private trial.
4. Now as to public policy, it is my personal conviction that all trials should be open to the public in the absence of some compelling documented reason to the contrary. I dare to say that, had I been the trial judge, I would have ruled differently. Regardless, and with all possible emphasis, I insist that this is a matter belonging within the sphere of the trial judge's power and discretion. It seems to me that this court has enough legitimate appellate business withough having to look over every judge's shoulder pendente lite to monitor and second guess his trial court techniques and discretion calls at the behest of some stranger.
If it is in the public's interest to have public trials in civil cases, then it is to be noted that the constitutional drafters did not so provide. They did so provide in criminal cases. However, those others particularly charged in such areas have an easy course. The Legislature meets annually and it could simply enact legislation so providing. It hasn't. By way of further possibility, the Florida Supreme Court possesses rulemaking power. It would be a very simple matter to enact a court rule governing this matter. It hasn't. So it is my feeling that the solution for relator's problem in wanting to know the private affairs of the Gleasons is to be sought either in the Legislature or the Supreme Court  not here.
5. This is, in truth, a simple case, which should be disposed of by a simple "denial" as a matter lying with the trial court's jurisdiction and discretion. An attempt should not be made to inflate it into landmark status, a Southern Reporter memorial.
The only thing I can discover unusual about this suggestion is the fact that Mr. Jackie Gleason is a nationally known public figure in the entertainment field, coupled with the fact that relators include a powerful and respected newspaper within this judicial district. Predictably, a result favorable to relators will gain the enthusiastic plaudits of the news media far and wide. I can not say that these considerations played any part whatever in this court's majority opinion, and I do not so suggest. However, I do say that we, by way of self-reminder as judges subject to the elective process, should be always sensitive to all pressures howsoever subtle in order that we be always even-handed  neither favoring the powerful nor penalizing them, and neither giving their appeals more or less attention than they legally deserve. And the humblest litigant likewise. In other words, we should always be alert to the sweet temptation of judicial opportunism. These seeming preachments are *791 perhaps unnecessary and it is not my purpose to offend. I mention them openly only as a touchstone and reminder for myself.
In conclusion, I dissent and say that I would deny relief to relators and allow the trial to proceed as ordered.
NOTES
[1] Pursuant to Rule 4.5, subd. d(2), F.A.R., the issuance of a rule nisi by the court acts as a stay of further proceedings in the trial until the merits of the petition are determined. Consequently, the hearing of December 3 was postponed.
[2] The decision in United Press Associations v. Valente, 1954, 308 N.Y. 71, 123 N.E.2d 777, reaches a conclusion contrary to that expressed in the Scripps case, supra. However, in Oliver v. Postel, 1972, 30 N.Y.2d 171, 331 N.Y.S.2d 407, 282 N.E.2d 306, the New York Appeals Court some eighteen years after Valente sought to distinguish and in essence modify its earlier decision with respect to the question of the standing of the media and the restraints imposed upon them.
[3] The courts have applied a "clear and present danger" test by which to measure the court's action restricting media presence and comment on criminal cases. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); United States v. Dickinson, supra; see also Brumfield v. State, supra.
[4] The value of a trade secret to its possessor could potentially be destroyed if the secret became known to the public or to the competitors; the use of special precautions to preserve the integrity of the procedure insofar as possible in the conduct of the litigation involving the same would therefore be justified. 62 A.L.R.2d, supra, at p. 513.
[5] See Sec. 742.031, F.S. (bastardy proceedings); sec. 39.03(1)(b) (certain juvenile proceedings); sec. 63.162 (adoption proceedings), and sec. 801.231 (testimony of juveniles concerning sex offenses  but note that although the public may be excluded "newspaper reporters" are excepted from such exclusion).
[6] In Rea v. Rea, 1952, 195 Or. 252, 245 P.2d 884, 35 A.L.R.2d 612, the court observed: "With the consent of both parties, expressed in open court, judges have invited the child into chambers and in quiet conversations have secured valuable insight into the child's attitude, whether of fear or of affection, toward a parent. It must be conceded that such informal procedure is likely to shed more light upon the issue than would result from subjecting the child to examination and cross-examination (perhaps after coaching) in open court... ."
[7] The decisions in Coggan v. Coggan, Fla. App. 1968, 214 So.2d 368, and Bloomer v. Bloomer, 1928, 197 Wis. 140, 221 N.W. 734, do not support the trial court's action in the instant case. The factual circumstances of those cases are substantially dissimilar from the instant case as to render those decisions distinguishable. In both cases the defendant-husband sought to set aside a divorce decree contending that it was error to exclude spectators from the hearing and to conduct a hearing in chambers. In neither case was objection raised by the public or press to the closed proceedings nor did the public or press seek to assert any right of access to the courts. In Coggan, the court found that the husband was not prejudiced as a result of the exclusion of spectators from his hearing; in Bloomer, the court additionally observed that the husband could not be heard to complain where the testimony taken in chambers was at his request.
[8] The observations made in Firestone, supra, with reference to "public figures" and "matters of public or general concern" are pertinent in the overall evaluation of a litigant's request for a closed hearing. Interestingly, both in the Firestone case and in the subsequent litigation between the parties recently reported in Firestone v. Time, Inc., Supreme Court of Florida, 305 So.2d 172, opinion filed December 11, 1974, the Supreme Court recognized that "the Firestone divorce action was unquestionably newsworthy". The Supreme Court ultimately held, however, that in publication of the Firestone divorce action Time, Inc. was not constitutionally protected from libel within the rationale of the so-called "New York Times doctrine". There is an obvious distinction between matters which are the subject of public or general interest insofar as it relates to access by the public and press to a judicial proceeding and matters which are the subject of public or general interest insofar as it relates to a constitutionally protected publication in a libel proceeding.
[9] Professor Wigmore concludes by observing, at p. 337: "In general, therefore, and as a rule, the trial must be conducted in such a way as to allow the access of the general public."
[10] As was aptly observed in the concurring opinion in United Press Association v. Valente, supra, "a citizen who was refused admission to a courtroom is denied the exact same kind of right as one turned away from a public park or schoolroom".