329 So.2d 333 (1976)
The MIAMI HERALD PUBLISHING COMPANY et al., Appellants,
v.
Agustin COLLAZO, and the City of Miami, Appellees.
No. 75-649.
District Court of Appeal of Florida, Third District.
March 9, 1976.
Rehearing Denied April 22, 1976.
*334 Paul & Thomson, Parker D. Thomson, Sanford L. Bohrer, Heller & Kaplan, Miami, for appellants.
Rentz, McClellan & Haggard, Fowler, White, Burnett, Hurley, Banick & Knight, Underwood, Gillis, Karcher, Reinert & Gordon, Miami, John U. Lloyd, City Atty., Fort Lauderdale, for appellees.
Before PEARSON, HENDRY and NATHAN, JJ.
HENDRY, Judge.
Appellants, The Miami Herald Publishing Company and Joe Oglesby, bring this appeal from an order of the trial court denying their petition for reconsideration of an order sealing the terms of a settlement agreement. The order also denied appellee The Miami News' motion to make public the terms of the final judgment. Due to its community of interest with appellants, appellee The Miami News will be considered for the purposes of this appeal as an appellant.
On November 19, 1973, appellee Agustin Collazo was shot by a City of Miami police officer during the course of a burglary investigation. As a result of the shooting, Collazo became paralyzed from the neck down. On January 1, 1974, he filed suit against The City of Miami alleging that police misconduct and improper police training caused his injuries. By amendment, the City's primary and excess insurance carriers were also joined as defendants.
A jury trial commenced on December 9, 1974, and on December 11, 1974, the case was settled. Prior to entering into a formal settlement, it was agreed by counsel for all parties that the terms of the settlement would not be made known to the press or to the public.
The settlement terms were reported in closed proceedings with only the parties, their counsel, and the court present. These proceedings were reported, in pertinent part, as follows:
"(The following proceedings were had without the presence of the jury.)
"... MR. KNIGHT: Come now the attorneys for their respective clients in open court, and move the Court for an order of dismissal with prejudice.
"Each party to bear their own costs. Grounds therefor counsel submit to the Court being that the parties have amicably disposed of their respective claims under the following terms and conditions:
"1) That the primary carrier for the City of Miami to-wit: Appalachian Insurance Company will tender its full and complete coverage in the sum of $ ____.
"2) That the excess carrier, Midland Insurance Company will tender to the plaintiff the sum of $ ____.
"And, in addition thereto, will satisfy the Jackson Memorial lien to the extent of an amount no greater than $ ____.
"In the event, however, that that lien can be satisfied at a lesser amount that is to his benefit.
"THE COURT: So stipulated, Gentlemen?
"Mr. McCLELLAN: So stipulated.
"MR. KARCHER: So stipulated.

*335 "But will the Court further instruct counsel so that they may in turn instruct their respective clients or the parties involved thereto, that this is to be a sealed settlement and that the terms and conditions of such settlement are not to be voluntarily disclosed to any media or to any other organization without specific stipulation of the Court? ..."
* * * * * *
"... THE COURT: Let the record also reflect that I have instructed the clerk of the court, the court reporter, and my bailiff that they are not to divulge any of this information at anytime to anyone and you, sir, Mr. Interpreter, you also are not at anytime, to anyone divulge any such information. Do you understand that, sir?
"THE INTERPRETER: Yes..."
* * * * * *
"... (The jury returned to the courtroom at 2:22 p.m.)
"THE COURT: Ladies and Gentlement of the Jury, it must be obvious to you that something has taken place in the interim period, otherwise you would have been called in long before this.
"I have just concluded a conference with the attorneys in my chambers where a question of settlement in this case was discussed.
"Following that discussion an agreement was reached by all parties concerned. This courtroom was then cleared for the purpose of the attorneys talking to their respective clients about the settlement involved. In that it was thought that this should be called a sealed verdict and that the amount of money involved was no one's business but those of the parties involved themselves, that was the reason this was done.
"A settlement agreement was reached satisfactorily to all of the parties concerned, and in view of those circumstances your services are no longer required in this case... ."
On December 26, 1974, appellee Collazo's counsel filed a satisfaction of judgment stating that the "sealed judgment as heretofore entered on the 11th day of December 1974 in Chambers for the sum of TEN DOLLARS AND NO/100 ($10.00) and other good and valuable considerations" had been satisfied.
Thereafter, appellants who had been publishing news articles in their respective newspapers concerning the filing of this action, the trial, and appellee Collazo, filed petitions for reconsideration of the trial court's order sealing the terms of the settlement agreement and the final judgment. On March 25, 1975, the trial court entered an order denying appellant's petitions. Basically, both petitions sought to make public the terms of the settlement agreement. From this order, appellants appeal.
Appellants contend that the trial court, by ordering a portion of the proceedings before it sealed from the press and the public, acted in excess of its jurisdiction, abused its discretion, and denied them their constitutional right to gather and publish the news. Appellee The Miami News concurs with the points raised on appeal by appellants and further contends that it has a fundamental constitutional right to have access to all judicial proceedings and the public has no less right.
Appellees Collazo and the City of Miami contend that the parties to civil litigation have a right to settle such litigation on terms that are acceptable to the respective parties without being forced to divulge the terms of the settlement to appellants.
The record shows that the City of Miami has insurance coverage with two carriers for the type of claim made here by appellee Collazo. Premium payments are made from the general operating funds of the City, which funds are obtained through various sources, e.g. real estate taxes paid *336 by taxpayers of the City, including appellants. The premium payable for the City's police primary insurance policy was increased in November, 1974, from $60,000 to $150,000 per year. The insurance carrier asserted that this adjustment was required by reason of the claims experience of the City.
The present insurance contracts, relevant to this appeal, terminate in November, 1975. Prior to their termination, the City will request bids for continued insurance coverage. The premium which the City will have to pay commencing in November, 1975, for this kind of insurance will be determined by its claims experience, including the settlement in this action.
Judicial powers possessed by a trial court are classified either as inherent powers, stemming from its existence as a court, or as powers which depend upon constitutional or statutory authorization for their exercise. Every court has the inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, subject to valid existing laws and constitutional provisions. These powers, however, must be invoked in the exercise of sound judicial discretion. See, e.g., Petition of Florida Bar, Fla. 1952, 61 So.2d 646; and 8 Fla.Jur., Courts §§ 40 and 41. Our first determination in the case sub judice, will be whether the trial court exceeded such discretion in sealing the terms of the settlement agreement and in denying appellants' petitions for reconsideration of the order sealing the terms of the agreement. In making this determination, it will be helpful to briefly consider the particular interests of the affected parties.
We should note that the questions presented by this appeal do not directly involve freedom of the press. However, pragmatically it must be recognized that if the press is excluded from a judicial proceeding or denied access to the result of such a proceeding it is unable to print and disseminate information which it deems newsworthy. As stated in Annot., 49 A.L.R.3d 1012 (1973), at page 1013, "... In a larger sense, freedom of the press loses some of its effectiveness when the press is denied access to information, and such a restriction should therefore be allowed only where other fundamental interests require it..."
What is directly involved here is the power and authority of the trial court to conduct a civil trial, involving a governmental entity as one of the parties, i.e., the City of Miami, and, based solely upon the expressed desires of the litigants, deny access to the press, i.e. appellants, of the terms of the settlement agreement concluding such litigation. We note that the trial below was open to the press and the public from its inception and only the terms of the settlement agreement, i.e., the dollar amounts actually awarded to appellee Collazo, were sealed.
As set forth in State Ex Rel. Gore Newspaper Company v. Tyson, Fla.App. 1975, 313 So.2d 777, at 782, a trial court in controlling its proceedings has the inherent power to preserve order and decorum in the court room, to protect the rights of the parties and witnesses, and generally to further the administration of justice. In furtherance of this power, there are numerous cases recognizing the power of the court to exclude the press and the public. A review and analysis of these cases, civil or criminal, reflect the existence of cogent reasons for such exclusion, all primarily concerned with guaranteeing the parties a fair and impartial trial. Additionally, the Florida Legislature has vested the courts with the statutory authority in certain types of proceedings to exclude the press and the public. See, e.g., § 39.03 Fla. Stat., F.S.A., (certain juvenile proceedings); § 63.162 Fla. Stat., F.S.A., (adoption proceedings); § 742.031, Fla. Stat., F.S.A., (bastardy proceedings). Suffice it to say, the power to exclude *337 exists, although it should be exercised cautiously and only for the most cogent reasons.
Juxtaposed with the right to exclude, is the right of the press or public to know. Here we start with some propositions repeatedly reaffirmed by the United States Supreme Court: that a trial is a public event; what transpires in the courtroom is public property; those who see or hear what transpired may report it with impunity; and there is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it. See, e.g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952); and Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). As quoted in State Ex Rel. Gore Newspaper Company v. Tyson, supra 313 So.2d at 785, the Supreme Court of California in an 1893 decision significantly observed:
"`... In this country it is a first principle that the people have the right to know what is done in their courts. The old theory of government which invested royalty with an assumed perfection, precluding the possibility of wrong, and denying the right to discuss its conduct of public affairs, is opposed to the genius of our institutions, in which the sovereign will of the people is the paramount idea; and the greatest publicity to the acts of those holding positions of public trust, and the greatest freedom in the discussion of the proceedings of public tribunals that is consistent with truth and decency, are regarded as essential to the public welfare. Therefore, when it is claimed that this right has in any manner been abridged, such claim must find its support, if any there be, in some limitation expressly imposed by the lawmaking power, or the right to exercise the authority claimed must be necessarily implied as essential to the execution of the powers expressly conferred... .' In re Shortridge, [99 Cal. 526] 34 P. 227, 228, 229."
An informed public depends on accurate and effective reporting by the news media. No individual can obtain for himself the information needed for the intelligent discharge of his political responsibilities. For most citizens the prospect of personal familiarity with newsworthy events is hopelessly unrealistic. In seeking out the news the press, therefore, acts as an agent of the public at large. It is one of the primary means by which we receive that free flow of information and ideas essential to intelligent self-government. The underlying right to know is the right of the public generally. See Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); and Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).
Although we are unaware of any specific constitutional or statutory provision giving the press or the public a right to attend a judicial proceeding, the "open court" concept is an indispensable part of our system of government and our way of life. See, e.g., Saxbe v. Washington Post, supra; Mills v. Alabama, supra; Sheppard v. Maxwell, supra; E.W. Scripps Company v. Fulton, 100 Ohio App. 157, 125 N.E.2d 896 (1955); and Brant, The Constitution and the Right to Know, in Mass Media and the Law 73 (D. Clark and E. Hutchison ed. 1970). As stated in State Ex Rel. Gore Newspaper Company v. Tyson, supra 313 So.2d at 783, "[t]he court's primary concern is for the litigants and in particular for their fundamental right to a fair trial. But the personal preference of litigants and a fair trial for litigants are two entirely different considerations."
We turn now to the appeal sub judice in light of the principles set forth *338 above. The record indicates the trial court, at the request of the parties, ordered that the terms of the settlement agreement, which implied liability on the part of the City of Miami for the actions of one of its police officers acting in his official capacity, were not to be made public. The only reasons shown in the record for not making the settlement terms public were the preference and agreement of the parties not to do so. Additionally, the trial court stated it was no one's business except that of the parties. Counsel for appellees also argue in their brief that the sole reason, for sealing the terms of the settlement agreement, was to assure the terms of the agreement would not adversely affect other pending claims against the City of Miami and its insurance carriers. Thus, the fair trial considerations, which have played a dominant role in other cases upholding the right to exclude or censor, appear to be absent in the present case. Here the terms of the settlement agreement were sealed after the basic trial process had ended. In our opinion, appellees' fear of the possibility that public knowledge of the settlement terms might affect other pending litigation involving them is not a cogent reason for sealing the terms of the settlement agreement, because they did not show that such disclosure would result in any immediate threat to the administration of justice. We think the right of the press and public to know should weigh heavily against a possible tendency to influence pending cases, particularly in borderline situations such as here. See Craig v. Harney, supra; Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); and Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). Further, appellants' right to know the terms of the settlement agreement is particularly compelling here because of the nature of the issues being litigated, i.e., alleged police misconduct and improper police training involving a City of Miami police officer acting in his official capacity. These issues created a substantial monetary liability for the City and influenced its insurance rates for the future, which costs must be borne by the taxpayers. Moreover, the activities complained about are by their very nature newsworthy. It is particularly in matters such as these that freedom of communication should be kept open and that none of the real issues or facts become obscured. See Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In short, we perceive none of the persuasive or cogent reasons generally required to justify denying the right of the press or public to know what takes place in the courts. As stated in State Ex Rel. Gore Newspaper Company v. Tyson, supra at 313 So.2d 787:
"History past and present has poignantly demonstrated the destructive effect of secrecy on our society  sowing seeds of suspicion and distrust between government and the governed. It would seem somewhat paradoxical for the very institution which has fostered a recognition of government in the sunshine and whose pronouncements are concerned with the administration of justice to take a backward step by enshrouding its own proceedings in secrecy solely to accommodate litigants. See the Judicature, vol. 58, No. 2, August 1974 `Let the Sunshine In: The Case for an Open Judicial System'."
We concur. Although it has been argued that the actual trial court proceedings were open to appellants and the entire court's file in the matter is available for their inspection, the fact remains that the terms of the settlement agreement upon which the parties relied in concluding their litigation, pursuant to an order of the trial court, remains sealed, unavailable, and unknown to appellants. We think this result, based on the facts of the instant appeal, are incompatible with the right of appellants to know. Also see United States v. Dickinson, 465 F.2d 496 (5 Cir., 1972). Therefore, we hold that the trial court abused its discretion in sealing the terms of the settlement *339 agreement. Due to this determination, it is unnecessary for us to consider the other points raised on appeal by appellants.
We have considered the record, all points in the briefs, and arguments of counsel in the light of the controlling principles of law and have concluded that reversible error has been demonstrated. Therefore, for the reasons stated and upon the authorities cited, the order of the trial court ordering the terms of the settlement agreement between the parties sealed is reversed.
Reversed.