387 So.2d 367 (1980)
SENTINEL STAR COMPANY, Petitioner,
v.
The Honorable Claude R. EDWARDS, Circuit Court Judge, Etc., Respondent.
No. 80-187.
District Court of Appeal of Florida, Fifth District.
July 9, 1980.
Rehearing Denied September 4, 1980.
William G. Mateer and David L. Evans of Mateer, Harbert, Bechtel & Phalin, P.A., Orlando, for petitioner.
Jim Smith, Atty. Gen., Tallahassee, and C. Michael Barnette, Asst. Atty. Gen., Daytona Beach, for respondent.
James A. Edwards and John H. Ward, Orlando, amicus curiae.
*368 John L. Sewell of Gurney, Gurney & Handley, Orlando, for Florida Defense Lawyers Association, amicus curiae.
Charles E. Davis, Orlando, for Lenore C. Starling.
COBB, Judge.
The petitioner Sentinel Star Co., publisher of a daily newspaper, challenges, by way of Rule 9.100(d), Florida Rules of Appellate Procedure, the action of the trial court in closing a civil post-trial hearing concerning a juror interview.
The events leading up to the closure order were as follows: A wrongful death action was filed by the personal representative of the Estate of Robert Wayne Starling, a deceased minor, against the City of Kissimmee and its liability insurance carrier. At the conclusion of the trial, the jury returned a verdict in favor of the defendant city. The plaintiff filed a timely motion for new trial and a motion to interview jurors based on information received indirectly from one Robert S. Johnson.
At the hearing, attended by a news reporter of the petitioner, the affidavit of Johnson was filed by the plaintiff in support of the motion to interview. The affidavit quoted an alternate juror, one Viola Warwick, as having told Johnson during the progress of the trial that the plaintiff would lose because of the jury's apprehension that a verdict against the city would result in increased utility rates.[1] The court ruled that the affidavit was untimely and declined to grant the motion. Plaintiff re-filed the motion to interview, together with the Johnson affidavit, and the motion was set for hearing on January 21, 1980. Meanwhile, the Sentinel Star contacted all but one of the jurors in the case and conducted its own interviews as to the truth of Johnson's allegations.
At the second hearing on the plaintiff's motion for a new trial and motion to interview, the attorney and a reporter for the Sentinel Star were present. The trial court heard argument on the motions, and ordered that an interview of the alternate juror, Viola Warwick, and the affiant, Robert S. Johnson, would be conducted on February 15, 1980. The trial judge further stated that he probably would hear no further argument on the motion for new trial unless he determined that there was some jury impropriety.
Prior to the February hearing the defendants, City of Kissimmee and Travelers Insurance Co., took Johnson's deposition. The plaintiff's motion to depose Viola Warwick was denied by the court. There is no indication from the record before us that the press was excluded from the Johnson deposition, or that it has been sealed by the trial court. It is not shown from the record before us whether or not this deposition was transcribed.
On February 15, 1979, the trial court conducted an open hearing on the motion for new trial, which hearing commenced at approximately 9:00 A.M. Then, at approximately 10:15 A.M., the trial judge sua sponte announced that the courtroom would be closed to the press and the public for the hearing on the motion to interview the juror, Viola Warwick, which had been granted on January 21, 1980. There had been no advance notice that closure would be considered. There is conflict in the record before us as to whether or not a reporter for the petitioner was present at that time; if not, he arrived shortly thereafter. Apparently, no one voiced an objection to closure at the time of the court's announcement.[2]
The reporter relayed the news of this development to newspaper headquarters in Orlando, which promptly dispatched an attorney. He obtained an audience with the *369 trial judge during the noon recess, and urged that the proceeding be opened to the press and public. The petitioner's counsel argued the case of Sentinel Star Co. v. Booth, 372 So.2d 100 (Fla. 2d DCA 1979) in opposition to the closure. Judge Edwards read the case, heard argument by counsel, and denied the ore tenus motion to open the hearing after announcing his view that Booth was distinguishable.
At the conclusion of the hearing, the trial court opened the courtroom and made the following announcement:
Members of the media, the Court has ruled that there will be no interviewing of the jurors who found the verdict in this case. That the plaintiff's Motion for a New Trial is denied. That the Court Reporter's notes are sealed. That everybody who has been in here is directed not to discuss the case beyond the findings I have mentioned. This comment comes from the Court, which is the grounds at the beginning of a one liner, explanation to you at the end. The Courts are directed to be very reluctant to permit interviews of jurors and do so with great circumspection and care. The Court felt this required the exclusion of the public and media and prohibition of the participants of discussing the case further, in the interest of preserving sanctity of jurors deliberation.
Thank you. I don't think there is going to be any more hearings before me about this matter.
The petitioner seeks an order from this appellate court suspending operation of the restrictive orders issued by the trial court on February 15, 1980; an order directing the respondent trial judge to have the court reporter's record of the closed hearing transcribed and made available to the press; and a blanket injunction prohibiting the trial court from issuing further injunctive orders in the case without following procedures set forth in the Booth case.
The petitioner claims that the order of closure violated its fundamental first amendment right of access to a judicial proceeding. It contends that the press is entitled to notice and hearing before a trial court can restrict such access.
Lenore C. Starling, plaintiff below, has filed an amicus curiae brief. She argues that Rule 1.431(g), Florida Rules of Civil Procedure, permits the trial court to prescribe the place, manner, conditions and scope of a juror interview; that this provision  related to 6th amendment rights to a fair trial and 7th amendment rights to a jury trial  includes the authority to exclude the press from such an interview; that there is no constitutional provision nor Florida case law which authorizes access of the press to civil post-trial proceedings, nor requires notice and hearing for such exclusion; that the trial court's announcement in open court of the closure, coupled with the subsequent presentation of argument by counsel for the petitioner, complied with the requirements of State ex rel. Miami Herald Publishing Co. v. McIntosh, 340 So.2d 904 (Fla. 1977); and that it is impractical and, indeed, impossible to notify all interested news media whenever a hearing must be closed, which is authorized by Rule 1.431(g) and recognized by Rule 9.100(d), Florida Rules of Appellate Procedure. Starling notes that there are a number of designated exceptions to the right of the press of access to judicial proceedings, such as trade secrets, bastardy proceedings, adoption proceedings, and circumstances involving the potential for physical harm or embarrassment to witnesses. See State ex rel. Gore Newspaper Co. v. Tyson, 313 So.2d 777, 783 (Fla. 4th DCA 1975), overruled on procedural grounds in English v. McCrary, 348 So.2d 293 (Fla. 1977). In conclusion, Starling relies on the statement from McIntosh that a trial court has the power to restrict statements by lawyers, litigants, witnesses, jurors and court personnel, and maintains that nothing more is involved in the present appeal.
The respondent Judge Edwards primarily relies upon the recent United States Supreme Court case of Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (hereinafter referred to as Gannett), and contends that it stands for the *370 proposition that the media has no constitutional right of access to pre-trial or post-trial hearings, criminal or civil. In support of this proposition, respondent also relies on Miami Herald Publishing Co. v. State, 363 So.2d 603 (Fla. 4th DCA 1978).
The respondent concedes that Gannett did not directly pass on the question as to whether the first amendment guarantees the public the right of access to pre-trial (hence post-trial) proceedings, but notes that the concurring opinion of Justice Rehnquist therein cites several prior United States Supreme Court decisions as holding that there is no first amendment right of access of the public or press to judicial or other governmental proceedings.[3]
The respondent also asserts that the press and the public are not entitled to formal notice and hearing prior to entry of an order closing court proceedings or court records or imposing a "gag" rule against appropriate court personnel, officers and attendants. He also relies on Rule 1.431(g), Florida Rules of Civil Procedure, as vesting the trial judge with discretion in regard to the closure of juror interviews. It is clear that the respondent draws no distinction between the interview of an alternate juror and the interview of regular jurors under the rule. Respondent also cites the case of Velsor v. Allstate Ins. Co., 329 So.2d 391 (Fla. 2d DCA 1976) for the proposition that public policy dictates that inquiry into the thought processes, motives or influences of jurors must be zealously guarded to prevent litigants or the public from invading the privacy of the jury room. The respondent also asserts that the "three-prong" test referred to in Booth is no longer required prior to entry of any restrictive order as a result of Gannett.
In addition, we have considered the briefs of amici curiae: Florida Defense Lawyers Association; John H. Ward, Esquire, and James A. Edwards, Esquire. The defendants at the trial level, the City of Kissimmee and its insurance carrier, have taken no position before us, pro or con, in regard to the propriety of the trial court's order of closure.
At the inception of our considerations, we should note, and emphasize, that the instant case is one of first impression inasmuch as we are dealing with an allegation of jury misconduct preceding jury deliberations and with a "juror interview" of an alternate juror who did not participate in those deliberations. From that perspective, we proceed to review of the McIntosh decision, wherein the Florida Supreme Court discussed the rights of the press of access to judicial proceedings. McIntosh must be evaluated in light of the subsequent Gannett opinion. The McIntosh case concerned security fraud charges emanating from a state-wide investigation, which had been the subject of wide-spread coverage by state and national press. Six criminal defendants joined in a motion to control pre-trial publicity. The motion was served only upon counsel for the state and for the defendants, and was heard along with other pre-trial motions. The trial judge in McIntosh entered an order which (1) prohibited members of the news media from reporting inadmissible testimony and evidence presented in open court outside the presence of the jury, and (2) enjoined counsel, state officials, law enforcement officers, witnesses, bailiffs, clerks and other officials in attendance from giving or authorizing extrajudicial statements or interviews relating to the trial, the parties or the issues.
The Miami Herald Publishing Co. sought revocation of this order. After hearing, its motion for relief was denied; a writ of prohibition sought from the District Court of Appeal, Fourth District, was also denied. The newspaper then petitioned to the Florida Supreme Court, seeking multiple forms of relief (prohibition, stay order, mandamus), which were denied; however, certiorari was granted. McIntosh, a criminal case, dealt with the order of the trial judge *371 as a form of prior restraint, in regard to its prohibition against the press reporting matters accessible to it in open court. The Florida Supreme Court viewed the case as one involving a clash between the sixth amendment fair trial rights of the defendants and first amendment rights pertaining to a free press. While acknowledging that the former has the preferred position in criminal proceedings,[4] the court observed that there must be a balanced reconciliation of these rights. Relying primarily on Nebraska Press Ass'n. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the court found that the heavy burden imposed as a condition to securing a prior restraint was not met by the trial judge, and that the per curiam affirmance by the Fourth District Court of Appeal was in conflict with the case of State ex rel. Miami Herald Publishing Co. v. Rose, 271 So.2d 483 (Fla. 2d DCA 1972). The court approved the Rose case as a correct statement of law, and quashed the decision of the Fourth District Court of Appeal.
In Rose the trial judge had entered an order restricting communications media from publishing any information about a murder case except testimony presented in open court. The appellate court invalidated the order as a prior restraint upon constitutionally privileged publication, which was unnecessary to secure the defendant a fair trial (which could have been achieved by jury sequestration and other procedural safeguards). The Second District Court of Appeal in Rose relied upon New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), a case wherein prior restraint, as opposed to closure of a pre-trial or post-trial hearing, was the issue.
It is apparent that McIntosh did not deal with a closure order,[5] unlike the instant case. Rather McIntosh dealt with prior restraint, an action of the trial court directed against publication by the news media, which was the first part of the trial court's order. For this reason, it cited the United States Supreme Court case of Nebraska Press. In regard to the second part of the trial court's order in McIntosh, the gag order imposed on counsel and various others, the language of the McIntosh majority opinion seems to indicate approbation of the trial court's action, but the decision of the district court was quashed without further explanation, leaving some doubt as to the status of Florida law on this latter point.[6]
In Gannett, the defendant in a much publicized murder case filed a motion to suppress incriminating statements and physical evidence. At the commencement of the pre-trial hearing, defense counsel argued that extensive adverse publicity had jeopardized the defendant's right to receive a fair trial, and requested that the public and the press be excluded from the hearing. The prosecutor did not oppose the motion. A Gannett Press reporter was present but made no objection to the motion, which was granted by the trial judge.
The next day, Gannett Press asserted a right to cover the hearing, requested access to the transcript, and filed a motion to set aside the exclusionary order. A hearing was held, at which time the trial judge stated that the press had a constitutional right of access which had to be balanced against the defendant's right to a fair trial. After weighing the probability of prejudice to the defendant, the trial judge ruled that the interest of the press and the public was outweighed by the fair trial considerations, refused to vacate his exclusion order, and denied immediate, although not ultimate, release of the transcript. This ruling was challenged by Gannett in the New York appellate court on the basis of the first, sixth and fourteenth amendments, eventuating in a grant of certiorari by the United States Supreme Court.
*372 In addressing the merits of the issue, the Supreme Court first determined that the sixth amendment right to a public trial is a right of the defendant in criminal cases only and not a right of the public or of the press; and that the history of the public trial guarantee demonstrates no more than the existence of a common-law rule of open civil and criminal proceedings.
The petitioner newspaper also asserted a right of access to pre-trial hearings by reason of the first and fourteenth amendments. The United States Supreme Court elected not to pass upon the existence vel non of such a constitutional right. It held, even assuming arguendo the existence of such a putative right in some situations, that it was given "all appropriate deference by the state nisi prius court in the present case" because: (1) there was no contemporaneous objection by any member of the public, including the reporter present, to the closure motion; (2) counsel for the newspaper was given an opportunity to be heard at a proceeding where he was allowed to voice the newspaper's objections to closure of the pre-trial hearing; (3) there was a balancing by the trial judge of any competing constitutional rights of the press and the defendants and an assessment of the competing societal interest involved rather than any determination that first amendment freedoms were not implicated; and (4) any denial of access in this case was not absolute but only temporary, since the transcript of the suppression hearing was made available once the danger of prejudice had dissipated. The judgment of the New York Court of Appeals upholding the exclusion of the press and public was affirmed.
McIntosh and Nebraska Press are prior restraint cases involving the clash of sixth and first amendment rights arising out of a criminal prosecution. The instant case is quite different. We are not dealing with a criminal case nor a prior restraint case. In light of Gannett, it is an open question as to whether or not closure of a pre-trial or post-trial judicial proceeding infringes first amendment rights of the press.[7]
The Booth case, attempting to follow McIntosh and Nebraska Press, erroneously applied a "three-prong" prior restraint analysis to a situation wherein a court file was sealed. See Booth at 102. Insofar as the "three-prong" test referred to in Booth is applicable to prior restraint cases it is not affected by Gannett.
The Gannett decision rejects the contention that the criteria set out in the Nebraska Press Association case should control a closure issue. Accord, The Miami Herald Publishing Co. v. Lewis, 383 So.2d 236 (Fla. 4th DCA 1980) (Anstead, J., specially concurring) [1980 FLW 335]; on rehearing entire opinion certified to Florida Supreme Court (May 21, 1980) [1980 FLW 954]. Gannett itself distinguishes cases such as Nebraska Press:
This Court's decision in Nebraska Press ... is of no assistance to the petitioners in this case. The Nebraska Press case involved a direct prior restraint imposed by a trial judge on the members of the press, prohibiting them from disseminating information about a criminal trial... . The exclusion order in the present case, by contrast, did not prevent the petitioner from publishing any information in its possession. The proper inquiry, therefore, is whether the petitioner was denied any constitutional right of access.
Gannett, 443 U.S. at 393 n. 25, 99 S.Ct. at 2412 n. 25, 61 L.Ed.2d at 630 n. 25.
We reject the petitioner's claim, based upon Booth, that it was entitled to notice and hearing in advance of closure. If Booth stands for prior notice and hearing in all access cases,[8] then we find Booth to *373 be in direct conflict with Gannett and unsupported by McIntosh.[9] There are circumstances, such as those in the present case, where subsequent opportunity to be heard will adequately protect the interests of the press and public.
Although neither McIntosh nor Gannett is clearly dispositive of the question presented by the instant petition, there is language in each which is helpful.
In McIntosh the Florida Supreme Court said:
[T]he public and press have a right to know what goes on in a courtroom whether the proceeding be criminal or civil. A member of the press or newspaper corporation may be properly considered as a representative of the public insofar as enforcement of public right of access to the court is concerned; and the public and press have a fundamental right of access to all judicial proceedings. In determining restrictions to be placed upon access to judicial proceedings, the court must balance the rights and interest of the parties to litigation with those of the public and press.
McIntosh at 908.
In support of the above statement, McIntosh cites the case of State ex rel. Gore Newspaper Co. v. Tyson. The headnote in Tyson referenced by the McIntosh opinion reads as follows:
Even though litigants may prefer to have their dissolution proceeding conducted in private away from the prying eyes of the public and the glare of the media, these desires cannot serve as a sufficient predicate upon which to exclude the public and press completely.
In Tyson, there is an extensive discussion of the rights of the public and the press in regard to access to civil courtroom proceedings. The Tyson opinion notes that the conduct of any trial, whether it be criminal or civil, is a public matter. See Craig v. Harney, 331 U.S. 367, 375, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).
While we find no specific constitutional or statutory provision speaking directly to the right of the public to attend a judicial proceeding (as distinguished from the right of every person to seek redress in the courts and the right to a public trial in a criminal proceeding as specifically stated in Sections 16 and 21, Declaration of Rights of the Florida Constitution), the `open court' concept is an indispensable part of our system of government and our way of life ... As pointed out in Scripps, [E.W. Scripps Co. v. Fulton, 100 Ohio App. 157, 125 N.E.2d 896 (1955)] at 900:
"... The basis of the constitutional guarantee of an "open court" is to be found in the development of the common law and would be a recognized right of the people without constitutional sanction.'

Public access to the courts is as fundamental as the litigant's right to a fair trial  hence the conflict and the inevitable balancing of rights and interests.
Tyson at 786.
Tyson's recognition of a common law right of access by the press to judicial proceedings is consistent with Gannett.[10] As the immortal Holmes once said:

*374 It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.
Cowley v. Pulsifer, 137 Mass. 392, 394 (1884), quoted in Globe Newspaper Co. v. Superior Court, ___ Mass. ___, 401 N.E.2d 360, 366 n. 6 (1980).
Applying the above concepts to the instant petition to review the trial court's order excluding the press from the juror interview on February 15, 1980, we conclude:
(1) The press and public had a common law right of access to the hearing. See Gannett, McIntosh, Tyson.
(2) The trial court had an inherent power to control the conduct of the proceedings before it. McIntosh at 909; Tyson at 782. This included the right to close the juror interviews where matters which may inhere in the verdict and the jury's deliberations may be revealed. See Marks v. State Rd. Dept., 69 So.2d 771 (Fla. 1954); see also, 32 Fla.Jur. Trial § 274 (1960). The rule limiting juror interviews is founded upon the sound policy of preventing litigants or the public from invading the privacy of the jury room. Velsor v. Allstate Ins. Co., Rule 1.431(g), Florida Rules of Civil Procedure, does not give the trial court additional authority to close juror interviews, but sets out the heretofore inherent discretion to control juror interview proceedings.
(3) The trial court gave as its reason for closing the interview of Viola Warwick and Robert Johnson the preservation of the sanctity of jurors' deliberation. Since the trial court was confronted with a motion to interview jurors and a suggestion of possible juror misconduct, it is readily understandable that the court was apprehensive and protective in regard to the traditional sanctity of the jury room. See 8 Wigmore, Evidence §§ 2345-2356 (McNaughten rev. 1961). We share and respect this concern. But under the unique factual circumstances of the instant case, no juror deliberations *375 were threatened with revelation at the investigative hearing held on February 15, 1980. Neither Johnson nor Warwick was privy to such deliberations. The matters raised by the Johnson affidavit, which was filed and thereby made public by the plaintiff Starling, related to acts which were wholly extrinsic to jury deliberations and ostensibly occurred during the progress of the trial. According to Marks:
[P]ublic policy protects a juror in the legitimate discharge of his duty, and sanctifies the result attained thereby; but if he steps aside from his duty, and does an unlawful act, he is a competent witness to prove such fact, and thereby prevent the sanction of the law from attaching to that which would otherwise be colorably lawful.
.....
[T]o hear such proof would have a tendency to diminish such practices and to purify the jury-room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them... .
Marks at 775, quoting, Wright v. Illinois & Mississippi Tel. Co., 20 Iowa 195, 210. Therefore, the justification recited by the trial court does not support closure.[11]
Accordingly, we decline to issue the blanket injunction sought against the trial judge; indeed, there is nothing to indicate that further closure orders are contemplated by the trial court. We order that a transcript of the closed hearing of February 15, 1980, be prepared at the cost of the petitioner and reviewed by the trial court; if there is no other basis for closure than that previously recited, said transcript shall be made available to the press, thereby rendering moot the gag order. If the trial court, upon reconsideration, finds some basis (other than the sanctity of jury deliberations) requiring sealing of the transcript in order to protect the fair trial rights of the litigants, the trial court shall recite said basis in a written order.[12]
The order of closure on the basis of the sanctity of juror deliberations is reversed and this cause is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED and REMANDED.
DAUKSCH, C.J., and ORFINGER, J., concur.
NOTES
[1] Petitioner has not presented to this Court a copy of the Johnson affidavit, although it was filed below and precipitated the present conflict. The parties appearing in this cause, however, do not dispute that Johnson's affidavit was to the effect set forth above.
[2] There is conflict between the petition of the Sentinel Star and the response of Judge Edwards as to whether or not a press representative was present at the time of the verbal order of closure, but no dispute that it was issued in open court prior to closure.
[3] Gannett, 443 U.S. at 403-406, 99 S.Ct. at 2918-2919, 61 L.Ed.2d at 636-638; see also Nixon v. Warner Comm., Inc., 435 U.S. 589, 609, 98 S.Ct. 1306, 1317, 55 L.Ed.2d 570 (1978); Saxbe v. Washington Post Co., 417 U.S. 843, 850, 94 S.Ct. 2800, 2815, 41 L.Ed.2d 495 (1974); Estes v. Texas, 381 U.S. 532, 539-540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965).
[4] Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Shepherd v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); United States v. Tijerina, 412 F.2d 661 (10th Cir.1969).
[5] State ex rel. Tallahassee Democrat, Inc. v. Cooksey, 371 So.2d 207, 209 (Fla. 1st DCA 1979).
[6] See McIntosh, 340 So.2d at 910-911.
[7] See generally, Note, Constitutional Law: Free Press or Fair Trial  The Dilemma of Conflict, 9 Stetson L.Rev. 214 (1979); Comment, 7 Fla.St. L.Rev. 719 (1979). The United States Supreme Court may offer clarification in the near future: Richmond Newspapers, Inc. v. Virginia, cert. granted, ___ U.S. ___, 100 S.Ct. 2814, 64 L.Ed.2d 973 (1979) (appeal from order excluding press and public in a capital murder trial).
[8] On the question of notice, the Fourth District Court of Appeal stated:

While formal written notice need not be served on all news media which could conceivably be interested, some notice should be given. The manner and extent of the notice will necessarily vary according to the circumstances of each case. Booth, 372 So.2d at 102.
[9] "The court should serve notice to news reporters present, but no order entered in good faith is invalid for lack of notice to one or more who may be unavailable to receive notice. Announcement from the bench or publication in writing in the courtroom should be adequate." McIntosh, 340 So.2d at 910.
[10] additional problem with the historical analysis of the petitioner and amici is that it is equally applicable to civil and criminal cases and therefore proves too much. For many centuries, both civil and criminal trials have traditionally been open to the public. As early as 1685, Sir John Hawles commented that open proceedings were necessary so `that truth may be discovered in civil and criminal matters' (emphasis added). Remarks upon Mr. Cornish's Trial, 11 How. State Trials 455, 460. English commentators also assumed that the common law rule was that the public could attend civil and criminal trials without distinguishing between the two. E.g., 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681) (`all Causes ought to be heard ... openly in the King's Courts'); 3 W. Blackstone, Commentaries *372 (1768); M. Hale, The History of the Common Law of England 343, 345 (6th ed. 1820); E. Jenks, The Book of English Law 73-74 (6th ed. 1967).
The experience in the American colonies was analogous. From the beginning, the norm was open trials. Indeed, the 1677 New Jersey Constitution, provided that any person could attend a trial whether it was `civil or criminal.' Concessions and Agreements of West New Jersey (1677), ch. XXIII, quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971) (hereinafter Schwartz) (emphasis added). Similarly, the 1682 and 1776 Pennsylvania Constitutions, both provided that `all courts shall be open' I Schwartz at 140, 271 (emphasis added).
If the existence of a common-law rule were the test for whether there is a Sixth Amendment public right to a public trial, therefore, there would be such a right in civil as well as criminal cases. But the Sixth Amendment does not speak in terms of civil cases at all; by its terms it is limited to providing rights to an accused in criminal cases. In short, there is no principled basis upon which a public right of access to judicial proceedings can be limited to criminal cases if the scope of the right is defined by the common law rather than the text and structure of the Constitution.
Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. While the operation of the judicial process in civil cases is often of interest only to the parties in the litigation, this is not always the case. E.g., Dred Scott v. Sanford, 60 U.S. (19 How.) 393, 15 L.Ed. 691; Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 53 Ohio Ops. 326, 38 A.L.R.2d 1180; Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750. Thus in some civil cases, the public interest in access, and the salutary effect of publicity, may be as strong or stronger than in most criminal cases. Gannett, 443 U.S. at 386, 99 S.Ct. 2908, 2909, 61 L.Ed.2d at 625-626 n. 15.
[11] By our action in this case we do not mean to say the trial judge acted arbitrarily, imprudently or unreasonably. To the contrary, his actions are quite understandable when viewed from the vantage point of the trial judge at the time the closure order was entered.
[12] If upon reconsideration of the balance of rights and interests the trial court determines there is a valid justification for sealing the record, the order need not reveal the matters entitled to protection but should sufficiently refer to the record to apprise the appellate court of the matters entitled to protection.